UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UTICA MUTUAL INSURANCE
COMPANY,

        Plaintiff,

        -v-                            6:13-CV-995

CENTURY INDEMNITY COMPANY,
as Successor to CCI Insurance Company,
as Successor to Insurance Company of
North America,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CENTURY INDEMNITY COMPANY,
as Successor to CCI Insurance Company,
as Successor to Insurance Company of
North America,

        Counter–Claimant,

        -v-

UTICA MUTUAL INSURANCE
COMPANY,

        Counter–Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

HUNTON ANDREWS KURTH LLP      SYED S. AHMAD, ESQ.
Attorneys for Plaintiff              WALTER J. ANDREWS, ESQ.
2200 Pennsylvania Avenue, NW
Washington, DC 20037

O'MELVENY, MYERS LAW FIRM   BRAD M. ELIAS, ESQ.
Attorneys for Defendant    NATHANAEL T. EVERHART, ESQ.
7 Times Square       TANCRED V. SCHIAVONI, ESQ.
Times Square Tower     TIMOTHY WOOD GRINSELL, ESQ.
New York, NY 10036     VINCENT S. WEISBAND, ESQ.

DAVID N. HURD
United States District Judge

## TABLE OF CONTENTS

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   A.  Utica's Filings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      1.  Utica's Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      2.  The 1975 Certificate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      3.  Century's Counterclaims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   B.  Century's Filings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      1.  Collateral Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      2.  Utica's Extra-Contractual Claims. . . . . . . . . . . . . . . . . . . . . . . . 22
         i.  Account Stated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
         ii.  Bad Faith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
         iii. Declaratory Judgment. . . . . . . . . . . . . . . . . . . . . . . . . 25
      3.  The Mid-Term Endorsement to the 1973 Umbrella. . . . . . . . . . . . . 26
      4.  Utica's Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>**MEMORANDUM–DECISION and ORDER**</u>

## I. <u>INTRODUCTION</u>

This is a dispute between plaintiff–counter–defendant Utica Mutual Insurance Company ("Utica"), a primary insurer, and defendant–counter–claimant Century Indemnity Company ("Century"), a reinsurer, over whether Century must reimburse Utica for certain sums paid out on behalf of Goulds Pumps, the underlying insured party, to resolve tens of thousands of asbestos exposure claims.

On August 16, 2013, Utica filed a four-count complaint in which it alleged Century (1) breached contractual obligations set forth in two reinsurance certificates executed between the parties covering the years 1973 and 1975; (2) owed the unpaid balance of prior billings under the two certificates; (3) violated the duty of utmost good faith and fair dealing by failing to pay those prior billings; and (4) is obligated to pay certain future billings arising from one or more of the certificates.

On September 17, 2013, Century answered Utica's complaint, denied most of the pertinent factual allegations, refused to acknowledge the existence of a valid 1975 reinsurance certificate, and asserted a variety of affirmative defenses. Almost immediately thereafter, the parties became embroiled in a series of sprawling discovery disputes that wound up consuming the better part of the 2014 calendar year and stretching into early 2015.

On February 4, 2015, Century sought leave from U.S. Magistrate Judge Andrew T. Baxter to amend its answer to assert bad-faith counterclaims against Utica. According to Century, the hard-fought discovery disclosures it had finally secured revealed that Utica had been "cooking the books" relevant to the parties' contractual relationship; i.e., Century

accused Utica of maintaining two sets of record-keeping systems to track asbestos settlements made on behalf of Goulds, allegedly part of a larger effort by Utica to conceal the fact it had been over-billing reinsurers, including Century, for these claims.

Judge Baxter granted Century's request and Utica filed an objection, which this Court overruled. Utica Mut. Ins. Co. v. Century Indem. Co., 2015 WL 3429116 (N.D.N.Y. May 11, 2015). Discovery continued throughout 2016, with the parties drawing Judge Baxter back into the process to mediate disputes over matters of privilege, the production of additional documents, and whether certain additional depositions should be conducted. This time around, Century filed a series of objections, which this Court again overruled. Utica Mut. Ins. Co. v. Century Indem. Co., 2017 WL 1052719 (N.D.N.Y. Jan. 18, 2017).

On March 29, 2017, the parties jointly requested, and Judge Baxter granted, a one-week extension to the dispositive motion deadline to afford both parties an opportunity to wrap things up. In accordance with this revised motion deadline, Utica filed three motions seeking partial summary judgment on various aspects of the litigation.

In particular, Utica (1) asserted that its own allocation decisions related to the coverage and handling of the asbestos claims against Goulds were reasonable and made in good faith; (2) claimed that the disputed 1975 reinsurance certificate is valid and binding on Century; and (3) argued Century has no right to claw back any sums previously paid to Utica.

Century responded with seven motions of its own: (1) it asserted Utica is collaterally estopped from re-litigating the issue of whether Century is obligated to pay certain defense costs; (2) it argued Utica's extra-contractual claims should be dismissed; (3) it moved for judgment on the pleadings on those same extra-contractual claims; (4) it sought summary judgment on the issue of whether the 1973 reinsurance certificate was validly modified by

Utica to cover certain costs; (5) it sought a determination that it cannot be bound by the 1975 reinsurance certificate; (6) it argued Utica's allocation decisions related to the coverage and handling of the Goulds asbestos claims were made in bad faith; and (7) it claimed Utica lacked standing to pursue any claims under the certificates because those rights have been assigned to a different insurance entity.

Thereafter, Utica (1) moved to strike Century's opposition to its motion for partial summary judgment on allocation; (2) requested that the Court refuse to consider certain arguments made by Century on various issues; and (3) moved to strike Century's reply filings as improper. Those three requests were denied by text order on March 27, 2018.

The ten remaining motions have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. __BACKGROUND__

Although the precise details necessary to resolve each of the pending motions will be discussed *infra*, some background on the general nature of reinsurance as well as the particular nature of the relationship between Utica and Century will first be recounted here in an effort to provide some much-needed context.[1]

Reinsurance relationships like the one at issue in this case are created "when one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer." Unigard Sec. Ins. Co., Inc. v. N.

---

[1] In the future, the parties should take care to carefully define any terms of art, colloquialisms, or other short-hand terminology on which they plan to rely in constructing their arguments. While these terms may find widespread use in the reinsurance industry, they most assuredly do not occupy a significant or recurring role in memoranda filed on this Court's civil docket. Regrettably, the end result of this complexity-without-context is an additional degree of delay in adjudication that might well have been avoided by a modicum of additional effort.

River. Ins. Co., 4 F.3d 1049, 1053 (2d Cir. 1993) (citation omitted).  As part of this arrangement, "[t]he reinsurer agrees to indemnify the ceding insurer on the risk transferred."  Id.

"There are two basic types of reinsurance policies—facultative and treaty."  Unigard Sec. Ins. Co., Inc., 4 F.3d at 1053 (citation omitted).  "In facultative reinsurance, a ceding insurer purchases reinsurance for a part, or all, of a single insurance policy.  Treaty reinsurance covers specified classes of a ceding insurer's policies."  Id.

Insurers use both kinds of agreements to "diversify the risk of loss and to reduce required capital reserves."  Unigard Sec. Ins. Co., Inc., 4 F.3d at 1053 (internal citation omitted).  "Spreading the risk prevents a catastrophic loss from falling upon one insurer.  By reducing the legal reserve requirement, the ceding insurer then possesses more capital to invest or to use to insure more risks."  Id.  (citation omitted).

In a reinsurance arrangement, the reinsurer is not directly liable to the original insured—reinsurance is a contract of indemnity, not liability.  Unigard Sec. Ins. Co., Inc., 4 F.3d at 1054.  As a result, reinsurers "do not examine risks, receive notice of loss from the original insured, or investigate claims."  Id.  In fact, a reinsurer typically has no contact whatsoever with the party who actually purchased insurance from the cedent.  Id.

This disconnect between a reinsurer and the underlying insured party has traditionally encouraged cedents and their reinsurers to conduct business by adhering to the legal standard of "utmost good faith."  Unigard Sec. Ins. Co., Inc., 4 F.3d at 1054.  After all, "repeat transactions are the norm" in the reinsurance world, and therefore the value of one's reputation as a trustworthy, reliable partner is "important to commercial success."  Id.

The value placed on these productive, long-running relationships ordinarily permits the parties to weather a full range of disputes. Indeed, "the loss of repeat business is a penalty that usually outweighs the short-term gains of misrepresentations or stonewalling contractual obligations." Unigard Sec. Ins. Co., Inc., 4 F.3d at 1054.

But as with any business relationship, that is not always what happens. So when an underlying insured and its cedent become mired in high-stakes litigation between themselves over how to weather a sudden influx of tens of thousands of potentially devastating claims, it can be challenging for the reinsurer—as the party forced to watch from the sidelines—to stay firm in the conviction that its reinsured can be trusted to act with "utmost good faith."

On occasion, closed-door negotiation of a multi-million dollar settlement agreement between the underlying insured and a cedent may even fuel the reinsurer's suspicion that its long-time business partner has plotted against it, robbing Peter to pay Paul. As it happens, a series of events unfolded between Goulds and Utica that eventually caused Century's suspicion about Utica's motivations to ripen into a belief that its cedent was up to no good.

Beginning in 1955 and continuing through at least the end of 1986, Utica issued yearly primary general liability insurance policies to Goulds Pumps. And between 1964 and 1983, Utica also issued seventeen umbrella liability policies to Goulds. Primary and umbrella policies generally obligate an insurer like Utica to defend and, where appropriate, to settle claims against a policyholder like Goulds.

Over the course of this thirty-two year business relationship, Utica would hedge its bets on these Goulds policies by partnering with reinsurers like Century to distribute the risk of possible loss from future claims. According to Utica's complaint, it purchased from Century two reinsurance certificates covering portions of certain umbrella policies issued to

Goulds:  (1) Certificate FRC 00978 related to a 1973 umbrella policy (the "1973 Certificate")

and (2) Certificate FRC 05441 related to a 1975 umbrella policy (the "1975 Certificate").

Utica contends that Century agreed to reimburse Utica for a specified percentage of

its expense payments (sums paid in connection with the defense of a claim) as well as a

percentage of its loss payments (sums paid to settle claims) under these two agreements.

Century, for its part, acknowledges it reinsured the 1973 Certificate in question but

flatly denies ever coming to terms with Utica on the 1975 Certificate.[2]  In support of this

denial, Century points out that Utica has not only failed to produce a physical copy of this

so-called 1975 Certificate, but also that Utica cannot identify any witness who can say with

personal knowledge that it was ever issued.  On the contrary, Century asserts that the

one-page piece of physical evidence Utica *has* produced to substantiate the existence of a

1975 Certificate is in fact nothing more than a non-binding quote or offer for coverage.

Even so, this dispute between the parties, along with a whole host of others at issue in

this litigation, might never have come to light were it not for the fact that, as the 1990s drew

to a close, tens of thousands of people started to become seriously ill from exposure to some

sort of toxic substance.

By December 2004, over 135,000 of these sick people (or their estates, as the case

increasingly became) had become convinced that asbestos or asbestos-containing products

were to blame for their illnesses, that Goulds products were a source of their asbestos

---

[2]  To be specific, Century acknowledges that Insurance Company of North America ("INA"), Century's predecessor, sold a facultative reinsurance policy to Utica for the period July 1, 1973 through July 1, 1974 (the "1973 Certificate") but denies reinsuring a facultative reinsurance certificate for the period July 1, 1975 through September 1, 1975 (the "1975 Certificate").

exposure, and that filing claims against Goulds and other asbestos manufacturers offered a means of relief.

This led Goulds to call on Utica, which went to work defending and indemnifying its insured against these asbestos claims in accordance with the terms of the old primary and umbrella insurance policies it had issued over the course of their thirty-two-year relationship. At the same time, Utica began billing Century and other reinsurers under the terms of the now-decades-old reinsurance certificates it had purchased from them.

So far, so good. But as the losses piled up, relations between Goulds and Utica broke down, degenerating into a series of disagreements over which entity should control the defense of the individual asbestos claims, how certain coverage should be allocated under the insurance policies, and whether the primary policies were subject to aggregate limits.

It wasn't just Utica, though. Goulds was feuding with its other liability insurers, too. In February of 2003, Goulds dragged Utica into existing coverage litigation it had filed in California state court. As part of that suit, Goulds alleged that certain Utica primary policies lacked aggregate limits, that those policies had not been exhausted, and that therefore Utica had failed to fulfill its obligations as the insurer of the primary and umbrella policies it issued to Goulds all those years before. Utica responded in October of that year by filing its own coverage suit against Goulds in New York state court.

In both the New York and California litigation, Goulds argued that certain primary policies it had purchased from Utica lacked aggregate limits. And in both suits, the parties sparred over which state's law should apply to the insurance contracts at issue.

To Utica, Goulds's assertion that the policies lacked aggregate limits under *California* law was the kind of make-or-break, bet-the-company type of issue that threatened disastrous financial ramifications for both parties.

This is because California law puts an insured in the driver's seat:  the state's "all sums" approach permits the insured to select the policy year in which a claim or claims are processed.  Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., 2018 WL 1737623 at *2 n.7 (N.D.N.Y. Mar. 20, 2018) (Sannes, J.).[3]

Thus, if Goulds managed to persuade either the New York or the California court to (1) apply California law to the parties' coverage dispute *and* to (2) find that one or more of the insurance policies issued by Utica lacked aggregate limits, Goulds could then designate that policy year or years for the handling of *all* of the thousands upon thousands of asbestos claims filed now or in the future.

Under that scenario, the primary policy designated by Goulds would never exhaust, the asbestos claims would never spill over into a reinsured umbrella policy layer, and Utica would be totally unable to recoup any of its mounting losses through the reinsurance process.  "With over 140,000 asbestos claims presented, that would be [a] catastrophic result for Utica."  Munich Reinsurance Am., Inc., 2018 WL 1737623 at *2 n.7.

---

[3] Conversely, New York's "pro rata" approach limits an insurer's liability "to sums incurred by the insured during the policy period; in other words, each insurance policy is allocated a 'pro rata' share of the total loss representing the portion of the loss that occurred during the policy period."  In re Viking Pump, Inc., 27 N.Y.3d 244, 256 (N.Y. 2016).  "Generally, '[p]roration of liability among the insurers acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy period' in claims alleging a gradual and continuing harm."  Id.  Pro rata payments are spread evenly across the applicable policy years and reach the next layer of coverage as lower-level policies exhaust.  See E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 172 (2d Cir. 2001).

It didn't take long for Utica to make clear to Goulds that this outcome would be bad for both of them, since forcing its insurer into bankruptcy threatened to reduce or eliminate Goulds's own chances at monetary recovery under the policies.  Ultimately, the parties chose to avoid the prospect of mutually assured destruction by working toward settlement.

In February of 2007, Utica and Goulds executed an agreement worth $325 million. Among other things hammered out in this agreement, the parties agreed between themselves that the primary policies contained aggregate limits, that the limits of those policies had already been exhausted, and that the settlement proceeds would therefore be paid out under the umbrella policies.  See, e.g., Munich Reinsurance Am., Inc., 2018 WL 1737623 at *3.

After the settlement, Utica went back to work defending Goulds and billing Century and its other reinsurers for claims under the reinsured portions of the umbrella policies.  And for a while, Century and other reinsurers continued remitting payments to Utica.

At some point, however, Century acquired information that convinced it Utica had inappropriately leveraged its reinsured umbrella policies as a bargaining chip during settlement negotiations after it realized the gravity of the threat posed by Goulds's litigating position vis-a-vis aggregate limits.  According to Century, Utica granted Goulds $140 million in additional umbrella coverage in exchange for Goulds's explicit agreement that the primary policies did in fact have aggregate limits and were in fact already exhausted.

Century accused Utica of colluding with Goulds to structure the settlement in a way that shifted millions of dollars in coverage from the *unreinsured* primary policies to the *reinsured* umbrella layers.  Utica denied the accusation and insisted that its decisions about how to allocate payments under the policies reinsured by Century and others were

unaffected by its settlement with Goulds.  When Century quit paying Utica's billings, Utica filed this suit.

## III.  LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim.  Anderson, 477 U.S. at 250 n.4.  The failure to meet this burden warrants denial of the motion.  Id.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party.  Jeffreys, 426 F.3d at 553.  Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the

[non-movant's] favor." <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); <u>see also</u> <u>Anderson</u>, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Where, as here, the parties have cross-moved for summary judgment, a reviewing court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." <u>Marcano v. City of Schenectady</u>, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.) (citation omitted).

In undertaking this analysis, it bears noting that "a district court is not required to grant judgment as a matter of law for one side or the other." <u>Marcano</u>, 38 F. Supp. 3d at 246 (citation omitted); <u>see also</u> <u>Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.</u>, 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.").

## IV. DISCUSSION

Although the parties have filed a total of ten different motions requesting various forms of relief, some of these requests amount to competing rulings on discrete issues (e.g., the parties' dispute over whether the 1975 Certificate is enforceable against Century). Accordingly, the grant or denial of one motion may operate to obviate detailed consideration of another. Those circumstances are noted where applicable.

### A. Utica's Filings

Utica has filed three motions for partial summary judgment. First, Utica contends that its allocation decisions concerning Century's financial responsibility were reasonable and

made in good faith as a matter of law.  Second, Utica claims Century has no valid defense

against the enforceability of the 1975 Certificate.  Third, Utica asserts that Century's

counterclaims for breach of contract (Count One) and a breach of the duty of utmost good

faith and fair dealing (Count Two) should be dismissed.

### 1. <u>Utica's Allocation</u>

Utica contends it allocated loss payments to the insurance policies at issue on a pro

rata basis before reaching a settlement with Goulds and asserts that these allocation

decisions remained unchanged after it consummated the 2007 settlement.  According to

Utica, Century's dispute on this issue essentially amounts to a demand for a more favorable

allocation "where it pays less and others, including other reinsurers, pay more."

Century responds that Utica's billings are inconsistent with the agreement it made with

Goulds and serve to demonstrate that Utica is actually attempting to "inflate its reinsurance

recovery by billing its reinsurer under a different set of rules than it had agreed to with its

policyholder."  According to Century, Utica granted Goulds an additional $140 million in

coverage that is not contemplated by the terms of the reinsurance contract.

"The follow-the-fortunes doctrine 'binds a reinsurer to accept the cedent's good faith

decisions on all things concerning the underlying insurance terms and claims against the

underlying insured:  coverage, tactics, lawsuits, compromise, resistance or capitulation.'"  <u>N.

River Ins. Co. v. Ace Am. Reinsurance Co.</u>, 361 F.3d 134, 139-40 (2d Cir. 2004) (quoting

<u>British Int'l Ins. Co. v. Seguros La Republica, S.A.</u>, 342 F.3d 78, 85 (2d Cir. 2003)).

"This doctrine insulates a reinsured's liability determinations from challenge by a

reinsurer unless they are fraudulent, in bad faith, or the payments are 'clearly beyond the

scope of the original policy' or 'in excess of [the reinsurer's] agreed-to exposure.'" Id. (quoting Christiana Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992)).

"But to say that a cedent's allocation decisions are entitled to deference is not to say that they are immune from scrutiny." U.S. Fid. & Guar. Co. v. Am. Re-Insurance Co., 20 N.Y.3d 407, 420 (N.Y. 2013). For instance, "[a] reinsurer is not bound by the follow-the-fortunes doctrine where the reinsured's settlement allocation, at odds with its allocation of the loss with its insured, designed to minimize its loss, reflects an effort to maximize unreasonably the amount of collectible insurance." Allstate Ins. Co. v. Am. Home Assur. Co., 837 N.Y.S.2d 138 (N.Y. App. Div. 1st Dep't 2007).

Upon review of the parties' submissions, Utica's motion for partial summary judgment on this issue must be denied. On the one hand, Utica presents evidence in support of its assertion that its allocation decisions were consistent, reasonable, and made in good faith. On the other, Century presents evidence in support of its accusation that Utica acted in bad faith by attempting to unreasonably maximize its recovery.

To be sure, a reinsurer accusing its cedent of bad faith conduct bears a heavy burden of proof. U.S. Fid. & Guar. Co., 20 N.Y.3d at 420 ("Cedents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own."). But when challenged, a cedent must also demonstrate the objective reasonableness of its conduct. See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., 238 F. Supp. 3d 314, 335-40 (N.D.N.Y. 2017).

Neither conclusion can be definitively reached on this record in light of the parties' competing evidentiary showings. In sum, neither party has established, as a matter of law,

the propriety (or impropriety) of the allocation decisions at issue here. Accordingly, Utica's motion for partial summary judgment on allocation will be denied.[4]

### 2. The 1975 Certificate

Next, Utica seeks summary judgment on Century's sixth affirmative defense; that is, Century's assertion that the 1975 Certificate identified by Utica is not a valid or binding contract on Century. Utica argues that the existence of a formal reinsurance certificate is actually "technically unnecessary" to establish a binding agreement. According to Utica, courts regularly accept secondary evidence offered by a party to establish the existence and terms of an agreement.

Century responds that while this may be true, Utica cannot point to satisfactory secondary evidence in this case. Alternatively, Century asserts that even if Utica could produce satisfactory evidence of the certificate's existence, this is a case of mistaken identity. According to Century, Utica's 1975 reinsurance agreement is with Randall & Quilter Investment Holdings, Ltd. ("R&Q"), an entity that bought out Insurance Company of North America - Reinsurance ("INA Re"). Century asserts that it is a successor to Insurance Company of North America ("INA"), *not* INA Re—while INA and INA Re were once affiliates, they were and are separate companies.

At the outset, the parties agree that the issuance of a "formal certificate of reinsurance" is "technically unnecessary for a binding agreement." Sumitomo Mar. & Fire Ins. Co. v. Cologne Reinsurance Co., 75 N.Y.2d 295, 302 (N.Y. 1990); see also United Fire & Cas. Co. v. Arkwright Mut. Ins. Co., 53 F. Supp. 2d 632, 640 (S.D.N.Y. 1999) ("[T]he

---

[4] Century's sixth motion for partial summary judgment will be denied for substantially the same reasons given here—disputes of fact preclude summary adjudication of the allocation issue.

communications exchanged between the parties can comprise a binding agreement such that the issuance of a formal certificate of reinsurance is technically unnecessary.").

The parties also agree that where, as here, "a plaintiff asserting coverage is not in possession of a policy, its existence may be proven by resort to secondary evidence." Bianchi v. Florists Mut. Ins. Co., 660 F. Supp. 2d 434, 437 (E.D.N.Y. 2009); see also Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002) (observing that were a diligent search proves unsuccessful, "an insured may rely on secondary evidence (i.e., evidence other than the policy itself) to prove the existence and terms of an insurance policy").

However, the parties do not agree as to the standard of proof required in lost policy cases, with Utica advocating a "preponderance of the evidence" and Century insisting that only "clear and convincing" evidence will do.

In Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co., 828 F. Supp. 2d 481, 490 (N.D.N.Y. 2011), this Court observed that the "clear and convincing" standard seemed more appropriate but declined to explicitly adopt a position on the issue at summary judgment. Id. at 490 n.10 ("[T]he issue of which standard applies is immaterial because . . . [plaintiff] cannot meet either standard."). Other courts have done roughly the same. See, e.g., Burt Rigid Box, Inc., 302 F.3d at 91 (awarding summary judgment to plaintiff "even if" the higher standard were held to apply).

More recently, however, Judge McAvoy observed that applying a "heightened evidentiary standard might actually encourage the insurer to destroy all copies of the policy, hoping the insured would not be able to produce one." Pac. Emp'rs Ins. Co. v. Troy Belting & Supply Co., 2016 WL 5477758 at *10 (N.D.N.Y. Sept. 29, 2016) (McAvoy, J.).

Under either standard, though, Utica's second motion for partial summary judgment must also be denied. Utica has identified documentary and other evidence tending to show the existence of a valid agreement for reinsurance from 1975. But Century's responsive submission also includes a significant amount of evidence undercutting Utica's factual assertions. Century has also introduced evidence that, if credited, might establish that Utica's 1975 reinsurance agreement was with INA Re, not INA. Because these kind of disputes are better left to a finder of fact, Utica's motion for partial summary judgment on Century's sixth affirmative defense will be denied.[5]

### 3. **Century's Counterclaims**

Finally, Utica has moved for partial summary judgment on Century's counterclaims for breach of contract (Count One) and breach of the duty of utmost good faith and fair dealing (Count Two). According to Utica, these counterclaims are an attempt by Century to recover the $5 million it previously paid to Utica. Utica contends that Century has no right to obtain any prior payments. Alternatively, Utica contends Century would still owe $5 million regardless of whether or not Utica's prior allocation decisions are vindicated in court.

Century responds that Utica withheld material information relevant to the reinsurance agreement in violation of the duty of utmost good faith and fair dealing owed by a cedent to its reinsurer. According to Century, Utica acted in bad faith by actively concealing information that only came to light during discovery.

---

[5] Century's fifth motion for partial summary judgment seeks dismissal of Utica's claim under the 1975 Certificate. That motion will be denied for substantially the same reasons given here—disputes of fact preclude summary adjudication of this issue.

"The duty of utmost good faith between a reinsurer and a reinsured requires the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." Fireman's Fund Ins. Co., 238 F. Supp. 3d at 347 (citation and internal quotation marks omitted).

"[T]he failure to disclose need not be fraudulent or even intentional,"; rather, "an innocent failure to disclose a material fact is sufficient." Gerling Global Reinsurance C.-U.S. Branch v. Ace Prop. & Case. Ins. Co., 42 F. App'x 522, 524 (2d Cir. 2002) (summary order) (citations omitted). "Non-disclosure of such material facts renders a reinsurance agreement voidable or rescindable." Id.

In light of this governing law, Utica's motion must be denied. Utica's supporting memorandum goes to great lengths to establish that Century knew about, but failed to act on, the alleged inconsistencies about which it now complains. But as Century explains, there is also evidence to indicate that it did not learn certain, particularly salient facts until it managed to force their production in discovery beginning in late October 2014.

And as Century points out, virtually all of Utica's legal theories—including waiver, estoppel, and assumption of risk—presuppose that the counter-party is in full possession of all the material facts underlying the conduct at issue, a state of affairs disputed in this litigation. In sum, the parties have established genuine factual disputes over who knew what and when. Munich Reinsurance Am., Inc., 2018 WL 1737623 at *27 (concluding substantially same). Accordingly, Utica's motion for partial summary judgment on Century's counterclaims will be denied.

**B. Century's Filings**

Century has filed seven requests for relief.  However, as noted *supra* in Section IV.A.1-2 and *infra* in Section IV.B.2, a separate discussion of Century's request for judgment as a matter of law concerning the 1975 Certificate and of its motion for judgment on the pleadings concerning Utica's extra-contractual claims is unnecessary.

**1. Collateral Estoppel**

Century's first motion for partial summary judgment seeks dismissal of Utica's claim that the 1973 Certificate obligates Century to pay for Utica's defense costs.  Century contends that Utica already fully and fairly litigated this question in an arbitration proceeding with R&Q, another reinsurer that challenged an identical obligation in a substantially similar reinsurance certificate.  According to Century, the outcome of the R&Q arbitration should be applied to estop Utica from re-litigating the question in this forum.  Utica responds by identifying a litany of reasons that collateral estoppel should not apply.

"Relitigation of an issue of fact or law is precluded on the basis of collateral estoppel if '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'"  Munich Reinsurance Am., Inc., 2018 WL 1737623 at *17 (quoting Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 918 (2d Cir. 2010)).

"Under New York law as it has evolved, collateral estoppel may also be applied, assuming there has been a final determination on the merits, to an issue resolved in arbitration."  Postlewaite v. McGraw-Hill, 333 F.3d 42, 48 (2d Cir. 2003).  "Application of the

estoppel following arbitration, however, may be problematic because arbitrators are not required to provide an explanation for their decision." Id.

While Century's arguments and evidence on this point are compelling, its motion must nevertheless be denied. By way of background, Century reinsured the umbrella policy Utica issued to Goulds in effect from July 1, 1973 to July 1, 1974 (the "1973 Umbrella Policy"). According to Utica, the 1973 Umbrella Policy included language (referred to by the parties as the "not covered by" provision) that permitted Utica to bill for defense costs.

As mentioned above, though, Century wasn't Utica's only reinsurer. R&Q also reinsured certain umbrella policies issued by Utica to Goulds between 1978 and 1982. As with the 1973 Umbrella Policy, the R&Q policies contained a nearly identical "not covered by" provision that Utica also relied on to bill for defense costs.

In November of 2008, the relationship between Utica and R&Q devolved after the parties disagreed over approximately $21.7 million in outstanding billings traceable to the R&Q reinsurance certificates. The parties jointly agreed to arbitrate their dispute and engaged in extensive briefing and argument before an arbitration panel.

On October 19, 2013, the arbitration panel issued its final order. Among other things, the arbitration panel concluded that the certificates reinsuring the 1978-1982 umbrella policies issued by Utica to Goulds do not cover defense costs. According to Century, this amounted to a rejection of Utica's claim that the "not covered by" provision permitted such costs. After Utica unsuccessfully sought partial reconsideration of the arbitral award, R&Q sought, and was granted, confirmation of the award in federal court.

Relying on the outcome of these arbitration proceedings, Century contends that Utica should be estopped in this action from what it argues is an attempt to re-litigate the meaning

of a "not covered by" provision, since substantively identical language appears in the 1973 umbrella policy at issue here. However, just as Judge Sannes observed in refusing to grant summary judgment to another of Utica's reinsurers who raised a similar estoppel argument, Century has failed "show[ ] with clarity and certainty what was determined by the prior judgment"; i.e., the precise contours of the arbitral award. <u>Munich Reinsurance Am., Inc.</u>, 2018 WL 1737623 at * 17. Accordingly, Century's motion for partial summary judgment on collateral estoppel will be denied.

### 2. **Utica's Extra-Contractual Claims**[6]

Century's second motion seeks to pare down Utica's complaint by requesting dismissal of Utica's claims for account stated (Count Two), bad faith (Count Three), and a declaratory judgment (Count Four).

### i. **Account Stated**

Century argues that Utica cannot sustain its claim for an account stated because Century disputed Utica's billings within a reasonable period of time. Utica responds that there are disputed issues of fact surrounding whether or not Century acted reasonably in investigating and in later disputing Utica's billings.

"An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due to the creditor." <u>United Capital Funding Corp. v. N.Y. City Dep't of Educ.</u>, 457 F. App'x 53, 54-55 (2d Cir. 2012) (summary order) (citation omitted). "Under long-settled New York law, which governs in this diversity action, a party who receives an account (that is, a statement that a certain sum is due to another party) is

---

[6] Century also attacks these three claims in its motion for judgment on the pleadings. Given the conclusions reached here, separate consideration of that motion is unnecessary.

bound to examine it and, if the party agrees that the account is correct, it becomes an 'account stated' and is binding on both parties." Id.

"Such an agreement may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." J.T. Magen & Co., Inc. v. Allen Edmonds Corp., 268 F. Supp. 3d 481, 487 (S.D.N.Y. 2017) (citation and internal quotation marks omitted).  However, "[w]here either no account has been presented or there is any dispute regarding the correctness of the account, the cause of action fails."  Id.

Under the circumstances presented by this case, no reasonable jury could conclude that Century failed to raise at least a general dispute as to Utica's billings within a reasonable period of time.  See, e.g., Herrick, Feinstein LLP v. Stamm, Jr., 746 N.Y.S.2d 712 (N.Y. App. Div. 1st Dep't 2002) (observing that even retention of an invoice without objection may not suffice depending upon the circumstances surrounding the submission of the statements).

After all, "[a] cause of action alleging an account stated cannot be utilized simply as another means to attempt to collect under a disputed contract."  Simplex Grinnell v. Ultimate Realty, LLC, 832 N.Y.S.2d 244, 245 (N.Y. App. Div. 2d Dep't 2007).  The parties' dispute in this case involves the terms and obligations of one contract (the 1973 Certificate) and the very existence of another (the 1975 Certificate).

The current record reveals that the parties have fought each other on these issues almost every step of the way.  No matter how Utica paints Century's conduct before and after it filed this lawsuit, its filings fail to demonstrate the sort of express or implied acquiescence to its billings that are a necessary predicate of an account stated claim.  Accordingly, Count Two of Utica's complaint will be dismissed.

## ii. __Bad Faith__

Century argues that Utica's bad faith claim must fail because Century had an arguable basis on which to investigate and challenge Utica's claims.  Utica responds that Century has employed inappropriate tactics to delay making payments under the reinsurance agreements.

"As in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" Bi–Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 194 (N.Y. 2008) (quoting N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318 (N.Y. 1995)).

However, "there remains a strong presumption in New York against a finding of bad faith liability by an insurer." Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 624 (2d Cir. 2001); see also Sukup v. State, 19 N.Y.2d 519 (N.Y. 1967) ("It is . . . well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy and is held responsible for the risk.").

"The presumption against bad faith liability can be rebutted only by evidence establishing that the insurer's refusal to defend was based on more than an arguable difference of opinion and exhibited gross disregard for its policy obligations." Hugo Boss Fashions, Inc., 252 F.3d at 625 (citation and internal quotation marks omitted).  As the New York Court of Appeals has explained, "[i]t would require a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be able to assert it." Id.

Unsurprisingly, the dueling legal memoranda submitted on this issue reveal that the parties dispute the precise timeline of events while accusing each other of failing to take certain steps to avert further litigation.  As Century details in its moving papers, both parties spent time searching their own and even each other's records for supporting documentation that might clarify or otherwise substantiate their obligations to each other.  Even now, after mountains of discovery of have been produced, certain questions seem to lack satisfying answers.

However, one thing is clear:  even crediting Utica's disputed factual contentions, the conduct of both parties and the sequence of events in this case make clear that Utica has not produced sufficient evidence to shoulder the burden of rebutting the general presumption *against* bad faith.  Simply put, no reasonable fact finder could conclude that Century lacked at least an *arguable* basis for objecting to, and investigating the basis for, Utica's claims.  See Hugo Boss Fashions, Inc., 252 F.3d at 625 (reversing denial of judgment as a matter of law where evidence demonstrated insurer had an arguable case); Fireman's Fund Ins. Co., 238 F. Supp. 3d at 332 (granting partial summary judgment against Utica where another reinsurer of its Goulds policies conducted similar investigation before challenging propriety of Utica's claims).  Accordingly, Count Three of Utica's complaint will be dismissed.

### iii.  **Declaratory Judgment**

Century argues that Utica's request for a declaratory judgment concerning future billings is moot because Utica has already issued final billings to Century.  Utica responds that it remains entitled to a declaration regarding the parties' rights and obligations under the 1973 and 1975 agreements.

The Declaratory Judgment Act vests district courts with "broad discretion" to decline jurisdiction over requests for declaratory relief, Dow Jones & Co., Inc. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003) (identifying factors relevant to exercise of such discretion, including, inter alia, "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved"; "whether a judgment would finalize the controversy and offer relief from uncertainty"; and "whether the proposed remedy is being used merely for procedural fencing, or a race to res judicata'" (internal quotation marks omitted)). Fort v. Am. Fed. of State, Cnty. and Mun. Emps., 375 F. App'x 109, 112 (2d Cir. 2010) (summary order).

Regardless of whether Century is correct about Utica's final billings, Utica's request for declaratory judgment is an attempt to sort out to the same rights that will be determined under its breach of contract claim in Count One. See Fireman's Fund Ins. Co., 238 F. Supp. 3d 325. (concluding same). Accordingly, Count Four of Utica's complaint will be dismissed.

### 3. **The Mid-Term Endorsement to the 1973 Umbrella**

Century also seeks partial summary judgment on the issue of whether a mid-term endorsement allegedly issued by Utica modifying certain terms of the 1973 umbrella policy it issued to Goulds can bind Century. According to Century, this endorsement was issued after the 1973 Certificate and effects changes in coverage to which Century never consented.

As Century explains, an umbrella policy ordinarily consists of a declarations page, a specimen form, and any applicable endorsements. In this case, a July 17, 1973 declarations page indicates the policy has a $25 million aggregate limit. This declarations page also cautions that there are endorsements attached to the policy; specifically, an audit endorsement, a pollution exclusion endorsement, and a nuclear exclusion endorsement. These endorsements all bear the same July 17, 1973 date of issuance.

In addition, the specimen form used by Utica indicated that the $25 million aggregate limit was eroded by both indemnity payments and defense costs. According to Century, there is no dispute that, at least at the time it was issued to Goulds, the 1973 umbrella policy only obligated Utica to pay for Goulds's defense costs within the policy's aggregate limit.

The disagreement comes over a mid-term endorsement to this 1973 umbrella policy allegedly issued by Utica to Goulds that alters how defense costs will be treated. According to Century, this endorsement is dated March 1, 1974, which means that it did not exist until nearly eight months *after* Century and Utica had already agreed to reinsurance terms.

Century argues that Utica cannot produce any evidence establishing that Century was ever made aware of, much less consented to, the changes outlined in this mid-term endorsement. To the contrary, Century claims Utica repeatedly represented to Century that the 1973 umbrella issued to Goulds was written on an "ultimate net loss basis with defense within limits." As a result, Century argues that Utica cannot now force it to abide by the covertly modified terms.

A review of the parties' submissions reveal genuine disputes of material fact that preclude summary resolution of this issue. Among other things, Utica has submitted evidence to substantiate its position that the mid-term endorsement did not actually "modify" the agreement in the manner claimed by Century. Instead, Utica argues that the 1973 Certificate permitted Utica, as cedent, to issue endorsements, like the mid-term endorsement at issue, without receiving consent from the reinsurer. According to Utica, standard underwriting practices would have required it to inform Century of any endorsements anyway—and that there is evidence to substantiate Utica's assertion that it acted in

conformity with those practices when transmitting endorsements to Century. Accordingly, Century's motion for partial summary judgment on this issue will be denied.

### 4. **Utica's Standing**

Finally, Century has moved to dismiss Utica's claims based on the 1975 Certificate for lack of standing or, in the alternative, for failure to join National Indemnity Company ("NICO") as the real party in interest. According to Century, Utica sold off its rights to any outstanding reinsurance billings under the Goulds settlement to NICO in September of 2012.

Utica responds that none of these agreements affect its ability to pursue claims against Century based on the reinsurance certificates. Utica maintains that while it may have assigned to NICO certain rights to collect proceeds from any recovery, it did not assign away the rights to the underlying "claims" against Century. Utica insists that, at best, Century has established that Utica partially assigned rights to specific proceeds arising from a single billing, leaving thirty-one other billings totally unaffected.

Century's challenge to standing is brought pursuant to Federal Rule of Civil Procedure ("Rule") 12(h)(3), which provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3).

"The standard governing a Rule 12(h)(3) motion is the same as that governing a motion under Rule 12(b)(1)." Jo v. JPMC Specialty Mortg., LLC, 248 F. Supp. 3d 417, 422 (W.D.N.Y. 2017). "The main distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party." Canadian St. Regis Band of Mohawk Indians v. New York, 388 F. Supp. 2d 25, 29 (N.D.N.Y. 2005) (McCurn, J.) (citation and internal quotation marks omitted); see also Cruz v. AAA Carting & Rubbish Removal, Inc., 116 F. Supp. 3d 232, 239

(S.D.N.Y. 2015) ("[T]he difference between a motion made under Rule 12(b)(1) and one made under Rule 12(h)(3) is largely academic, and the same standards are applicable to both types of motions.").

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." N.Y. by Schneiderman v. Utica City Sch. Dist., 177 F. Supp. 3d 739, 745 (N.D.N.Y. 2016) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2003)). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Id. at 746 (quoting Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005)). "In determining the existence of subject matter jurisdiction, a district court may consider evidence outside the pleadings." Id. (quoting Saleh v. Holder, 84 F. Supp. 3d 135, 137-38 (E.D.N.Y. 2014)).

To establish Article III standing, "a plaintiff must show (1) that it 'suffered an injury in fact,' (2) 'a causal connection between the injury and the conduct complained of,' and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Upstate Citizens for Equality, Inc. v. United States, 841 F.3d 556, 565 (2d Cir. 2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S.555, 560-61 (1992)).

Upon review, Century's challenge to Utica's standing is rejected. Utica has submitted evidence tending to establish (1) it was a party to the 1973 and 1975 certificates; (2) it has billed Century, the alleged counter-party, for amounts due under those certificates; (3) Century has breached its promise by failing to pay amounts due under the agreement(s); and (4) Utica has suffered economic harm as a result.

Century might ultimately limit or even escape liability under one or more of the certificates by, say, persuading a finder of fact that it is *not* the counter-party to the 1975 Certificate or that Utica's allocation decisions under the 1973 Certificate were unreasonable or made in bad faith. But at this stage of the proceedings Utica's submissions are sufficient to avoid dismissal on the basis of standing.

Century further contends that this action should be dismissed because Utica has completely assigned away any and all rights in the certificates. The alleged assignment at issue happened on September 28, 2012, when Utica and NICO entered into a pair of agreements: a Factored Receivables Agreement ("Receivables Agreement") and a National Division Run-Off Reinsurance Agreement ("Run-Off Agreement"). NICO tasked Resolute Management, Inc. ("Resolute") to administer the two agreements.

Under the Receivables Agreement, Utica assigned to NICO "any and all rights . . . to the Factored Receivables on the Business Covered." The Receivables Agreement defined "Factored Receivables" as "all receivables billed and uncollected . . . that arise out of or relate to the Business Covered and which are payable under the Third-Party Reinsurance Agreements . . . including those set forth on Schedule 1.1 hereto."

The Receivables Agreement further defined "Third-Party Reinsurance Agreements" to include the 1975 Certificate in dispute. The Receivables Agreement also provided that "[a]ny resolution or settlement of a Factored Receivable by way of cash payment or set-off shall be the property of [NICO], and all Factored Receivables actually collected . . . shall be for the benefit and account of [NICO]."

Century explains that, after Utica's agreement with NICO was put in place, Resolute, not Utica, began to issue billings for the 1973 Certificate and 1975 Certificate, and in each

instance those bills directed Century to remit payment to an account controlled by NICO, not Utica.

Century also flags as relevant another set of agreements. On April 25, 2016, NICO, Utica, Goulds, and others entered into an agreement (the "Release Agreement") whereby Goulds provided Utica "with a complete release of all pre-1986 Utica policies issued to Goulds" and confirmed that "Utica has no further obligations" under the 2007 settlement. In addition, NICO entered into an agreement with Goulds to pay a fixed sum between now and 2021 (the "NICO Payment Agreement").

Taken together, Century asserts that these agreements operate to establish Utica's complete assignment of its right to assert any claims arising under the certificates. But as Utica points out, the upshot of these agreements seems to be that any proceeds from a recovery secured in litigation by Utica will flow to NICO. See, e.g., Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 287 (2008) ("[F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit.").

Nothing in Century's submissions conclusively demonstrates that Utica has assigned away its rights to pursue an underlying *claim* arising from breach of the certificates. W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 108 (2d Cir. 2008) ("[A]n assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an 'injury-in-fact.'").

Century's alternative claim is that Utica has failed to join NICO as the real party in interest is brought pursuant to Rule 17(a)(1), which provides that "[a]n action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1).

As the Second Circuit has recently explained, "[t]he real party in interest principle embodied in Rule 17 ensures that only a person who possesses the right to enforce [a] claim and who has a significant interest in the litigation can bring the claim." <u>Cortlandt St. Recovery Corp. v. Hellas Telecomm. I, S.a.r.L.</u>, 790 F.3d 411, 420 (2d Cir. 2015) (citation and internal quotation marks omitted); <u>see also</u> <u>Gogolin & Stelter v. Karn's Auto Imports, Inc.</u>, 886 F.2d 100, 102 (5th Cir. 1989) ("The purpose of the rule is to prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by res judicata principles.").

Upon review, this argument is also rejected. Utica, as party to the underlying certificates, is the proper party to pursue a claim based on an alleged breach of the obligations set forth in them. In other words, Utica has a sufficient stake in the matter to continue to pursue this litigation. Accordingly, Century's motion to dismiss will be denied.

## V. <u>CONCLUSION</u>

The parties various motions are denied save for Century's motion to dismiss Utica's extra-contractual claims, which is granted. The parties are encouraged to resolve their outstanding disagreements in this matter without further intervention from the Court.

Therefore, it is

ORDERED that

1. Utica's motion for partial summary judgment on allocation is DENIED;

2. Utica's motion for partial summary judgment on Century's sixth affirmative defense is DENIED;

3. Utica's motion for partial summary judgment on Counts One and Three of Century's counterclaim is DENIED;

4.  Century's motion for partial summary judgment on collateral estoppel is DENIED;

5.  Century's motion for partial summary judgment on Utica's extra-contractual claims is GRANTED;

6.  Century's motion for judgment on the pleadings dismissing Utica's extra-contractual claims is DENIED as moot;

7.  Century's motion for partial summary judgment on the mid-term endorsement to the 1973 umbrella policy is DENIED;

8.  Century's motion for partial summary judgment on Utica's claim against the 1975 Certificate is DENIED;

9.  Century's motion for partial summary judgment on Utica's allocation is DENIED;

10.  Century's motion to dismiss for lack of standing or failure to prosecute as the real party in interest is DENIED; and

11.  Utica's extra-contractual claims are DISMISSED.

IT IS SO ORDERED.

Dated:  September 26, 2018
        Utica, New York.

_____
United States District Judge