UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UTICA MUTUAL INSURANCE
COMPANY,

        Plaintiff,

      -v-                      6:13-CV-995

CENTURY INDEMNITY COMPANY,
as Successor to CCI Insurance Company,
as Successor to Insurance Company of
North America,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                 OF COUNSEL:

HUNTON ANDREWS KURTH LLP      SYED S. AHMAD, ESQ.
Attorneys for Plaintiff             LATOSHA M. ELLIS, ESQ.
2200 Pennsylvania Avenue, NW     PATRICK M. MCDERMOTT, ESQ.
Washington, DC 20037           WALTER J. ANDREWS, ESQ.

O'MELVENY, MYERS LAW FIRM       BRAD M. ELIAS, ESQ.
Attorneys for Defendant           NATHANAEL T. EVERHART, ESQ.
7 Times Square                  TANCRED V. SCHIAVONI, ESQ.
Times Square Tower             VINCENT S. WEISBAND, ESQ.
New York, NY 10036             REDWAN SALEH, ESQ.

E. STEWART JONES HACKER MURPHY, LLP   JAMES E. HACKER, ESQ.
Attorneys for Defendant
28 Second Street
Troy, NY 12180

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

This is the epilogue to a hard-fought contract dispute between plaintiff Utica Mutual Insurance Company ("Utica"), a primary insurer, and defendant Century Indemnity Company ("Century"), a reinsurer, over Century's alleged breach of two indemnity agreements purchased by Utica in the 1970s.

On September 30, 2019, after hearing two full weeks of evidence, a jury returned an across-the-board verdict for Utica on both of its claims, rejecting in the process a bad-faith counterclaim brought by Century. Dkt. No. 628. Because the parties had stipulated to the unpaid principal on the two reinsurance agreements, the Court accounted for pre-judgment interest at the applicable statutory rate and entered a $6,257,889.02 judgment in Utica's favor. Dkt. No. 630.

On October 18, 2019, Century moved under Federal Rule of Civil Procedure ("Rule") 60(a) and Rule 59(e)[1] to correct an alleged error in the interest calculation reflected in the $6 million money judgment. Dkt. No. 652. Century also renewed its Rule 50(b) motions for judgment as a matter of law and, in the alternative, moved for a new trial under Rule 59(a)(1). Dkt. No. 653; *see also* Dkt. Nos. 624-26.

The motions have been fully briefed. Century requested oral argument on its motion to correct the judgment, Dkt. No. 659, but upon review of the filings the Court has concluded that the issue should be resolved on the parties' briefs alone. Accordingly, both motions will be decided on the basis of the submissions without oral argument.

---

[1] Century noticed this branch of its motion under section (a) of Rule 59, but as Utica points out, the relief sought by Century would come from section (e). Pl.'s Opp'n, Dkt. No. 656 at 9 n.2.

## II. DISCUSSION

For brevity's sake, the trial transcript and other relevant materials will be referenced only as necessary to resolve the final round of motion practice. However, an ambitious reader seeking a blow-by-blow account of this dispute should consult the final pre-trial Memorandum–Decision & Order for a thorough recitation of the procedural history, *Utica Mut. Ins. Co. v. Century Indemnity Co.*, 2018 WL 4625404 (N.D.N.Y. Sept. 26, 2018), *reconsideration denied*, 2018 WL 6258560 (N.D.N.Y. Nov. 30, 2018), and the ten-volume transcript of the trial proceedings for answers to any substantive questions about how the claims and defenses fit into the parties' competing narratives, Dkt. Nos. 633-49.

### A. Pre-Judgment Interest

In its first motion, Century contends the Court awarded Utica too much pre-judgment interest. According to Century, the judgment must be reduced by roughly $280,000 to prevent Utica from enjoying an improper windfall at Century's expense. Def.'s Mem., Dkt. No. 652-1 at 5-7.[2]

To understand Century's problem with the interest component of the award, it helps to start with an understanding that the $6,257,889.02 money judgment is actually the sum of two different principal amounts added to two separate awards of pre-judgment interest calculated from two distinct dates. Dkt. No. 630.

First, for Utica's successful claim under the 1973 agreement, there is a sum of $4,354,004.92, which includes principal of $2,760,533.96 plus interest of $1,593,470.96 running from May 3, 2013. Dkt. No. 630. Second, for Utica's successful claim under the

---

[2] Pagination corresponds to CM/ECF.

1975 agreement, there is a sum of $1,903,884.10, which includes principal of $1,103,271.62 plus interest of $800,612.48 running from September 9, 2011.  *Id*.

Century acknowledges the dates used in calculating these interest awards—May 3, 2013 and September 9, 2011—were selected by the jury in response to a pair of interrogatories posed on the verdict form.  Def.'s Mem. at 3; *see also* Court's Ex. 4, Dkt. No. 628 at 2-3.

Even so, Century complains it is improper to use these dates to calculate interest on the *entire* principal amount of each agreement.  Def.'s Mem. at 3.  As Century explains, these two dates coincide with the dates of Utica's *initial* billings under each agreement, not the dates of any final or complete billings under either contract.  *Id*.  Because "the amounts of the initial billings were only a fraction of the total amounts that Utica ultimately billed," Century's argument goes, setting interest to run from the dates of the initial bills gives Utica an improper windfall recovery.  *Id*.

Century contends the better course of action would be to engage in a more detailed accounting of pre-judgment interest.  *See* Def.'s Mem. at 3, 5-7.  Rather than running from a single date for each agreement, Century argues interest should be re-calculated to run on a series of smaller principal amounts measured from a series of different dates; *i.e.*, each date on which Utica sent out a specific bill to Century.  *Id*.  According to Century, the Court can accomplish this task without further aid from the jury because "the dates and amounts of Utica's bills are in the record and undisputed."  *Id*. at 6.  In fact, Century has provided a spreadsheet that allegedly accounts for pre-judgment interest using this more detailed approach.  *Id*. at 4-5.

Century maintains that this is the kind of simple math error that can be corrected under Rule 60, which provides in relevant part that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." FED. R. CIV. P. 60(a); *see also L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 956 F. Supp. 2d 402, 408-09 (E.D.N.Y. 2013) ("The general purpose of Rule 60(a) is to afford courts a means of modifying their judgments in order to ensure that the record reflects the actual intentions of the court.").

Alternatively, Century asks the Court to amend the money judgment under Rule 59(e), which empowers a district court "to rectify its own mistakes in the period immediately following the entry of judgment." *Greene v. Town of Blooming Grove*, 935 F.2d 507, 512 (2d Cir. 1991) (citation omitted); *see also Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) ("[D]istrict courts may alter or amend judgment 'to correct a clear error of law or prevent manifest injustice.'" (citation omitted)).

In opposition, Utica argues that the Court got all these numbers right the first time. Pl.'s Mem., Dkt. No. 656 at 4. Utica points to a companion case tried to a jury before this Court last year, where it won another money judgment against another reinsurer that refused to honor indemnity agreements similar to the two at issue here. *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 287 F. Supp. 3d 163 (N.D.N.Y. 2018), *appeal filed*, 18-828 (2d Cir. Mar. 27, 2018).[3]

In that case, the Court also calculated an award of pre-judgment interest to run from a single date chosen by the jury in response to a specific interrogatory posed on the

---

[3] A panel of the U.S. Court of Appeals for the Second Circuit heard argument on August 29, 2019, but the matter remains pending.

verdict form. *Fireman's Fund Ins. Co.*, 287 F. Supp. 3d at 174. And there, as here, the defendant–reinsurer moved under Rule 60(a) to correct the judgment based on the notion that the date selected by the jury, which also coincided with the date of Utica's first billing under the contract, amounted to an improper windfall. *Id*.

*Fireman's Fund* rejected the defendant–reinsurer's Rule 60(a) motion as procedurally improper, concluding "such a revision would be substantive rather than clerical." *Fireman's Fund Ins. Co.*, 287 F. Supp. 3d at 174. In reaching that conclusion, *Fireman's Fund* noted that the kind of revision sought by the defendant–reinsurer "would require a finding of fact regarding the (additional) dates from which the interest would run." *Id*. However, that kind of *post hoc*, substantive revision to the judgment would be improper now because "[t]hose facts [were] properly ones for a jury to decide." *Id*.

Utica argues the same result is appropriate in this case, at least as to Century's Rule 60(a) motion, because Century is seeking the kind of revision to the judgment that this Court has already expressly concluded is substantive rather than clerical. Pl.'s Mem. at 4-6. As Utica correctly notes, Century's opening brief does not distinguish the holding or rationale of *Fireman's Fund* or explain why the Court should reach a different result this time. *Id*.

Utica goes on to claim that Century is wrong on the merits, anyway. According to Utica, New York law permits pre-judgment interest on multiple bills to run from a single date where, as here, the counter-party has fully repudiated its obligation to pay on the future billings. Pl.'s Mem. at 7-9. Even assuming otherwise, though, Utica insists a substantive revision would still be improper because Century failed to raise the issue before the entry of judgment. *Id*. at 9.

In reply, Century contends that *Fireman's Fund* does not control the outcome here because unlike the defendant–reinsurer in that case, Century has also sought relief under Rule 59(e), which permits amendments that go beyond mere clerical errors or oversights.  Def.'s Reply, Dkt. No. 658 at 7.

In Century's view, a substantive amendment under Rule 59 is appropriate "where, as here, the calculation of prejudgment interest is inconsistent with the undisputed trial evidence."  Def.'s Reply at 5.  According to Century, the re-calculated interest award tallied up in the chart from its opening brief is drawn directly from *undisputed* documentary submissions that Utica itself moved into evidence at trial.  *Id*. at 7, 13.

Century further contends that Utica's assertion about New York law permitting interest to run from the date of an initial billing in cases where the counter-party repudiates its future obligations is wrong on the law.  Def.'s Reply at 8-12.  Century argues that, even under those circumstances, the applicable provisions of New York's Civil Practice Law and Rules ("CPLR") makes clear that an award of pre-judgment interest on multiple billings must still run from a "reasonable intermediate date," not the date of the *first* billing.  *Id*.

Under New York law, pre-judgment interest is a mandatory component of the damages awarded on a breach of contract claim.  N.Y.C.P.L.R. § 5001(a); *J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*, 957 N.Y.S.2d 275, 277 (N.Y. 2012) (reiterating mandatory nature of interest award in breach of contract action).  And it accrues at a statutory rate, which is fixed at nine percent per annum.  N.Y.C.P.L.R. § 5004.

The rationale for awarding this type of interest "is founded on the theory that there has been a deprivation of the use of money or its equivalent, and that an award of interest will make the aggrieved party whole."  *Spodek v. Park Prop. Dev. Assoc.*, 719 N.Y.S.2d 109, 110

(N.Y. App. Div. 2d Dep't 2001) (citations omitted); *see also Woodling v. Garrett Corp.*, 813 F.2d 543, 561 (2d Cir. 1987) ("The purpose of a prejudgment interest award is to remedy the delay in compensating a plaintiff for a loss.").

As a necessary corollary to this reasoning, the CPLR instructs that pre-judgment interest should be computed "from the earliest ascertainable date the cause of action existed." N.Y.C.P.L.R. § 5001(b). Where, as here, the cause of action is for breach of contract, the claim "accrues at the time of the breach." *Ely–Cruikshank Co., Inc. v. Bank of Montreal*, 599 N.Y.S.2d 501, 502 (N.Y. 1993) (citations omitted).

Notably, though, CPLR § 5001(b) provides a further wrinkle if some portion of a prevailing party's damages were incurred after the cause of action initially accrued. Under those circumstances, the CPLR "provides two methods for avoiding overcompensating the plaintiff when prejudgment losses have occurred over a period of time: interest may be computed from the various dates on which the losses occurred, or it may be computed on all prejudgment losses 'from a single reasonable intermediate date.'" *Woodling*, 813 F.2d at 561 (applying CPLR § 5001(b) to prevailing party's monetary recovery on a tort claim).

Finally, "[n]otwithstanding the mandatory language of the statute, some New York courts appear to have forged an exception to mandatory prejudgment interest to prevent windfalls in favor of plaintiffs." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 858 F.3d 744, 751 (2d Cir. 2017); *see also GE Funding Capital Mkt. Servs., Inc. v. Nebraska Inv. Fin. Auth.*, 767 F. App'x 110, 115 (2d Cir. 2019) (summary order) (observing that "New York courts accordingly have looked to the economic realities of a given case to avoid conferring windfalls in the form of prejudgment interest").

But what about a situation like this one, where the jury selected the specific dates from which interest should run?  After all, New York law expressly contemplates sending this issue to a finder of fact.  *See* N.Y.C.P.L.R. § 5001(c) ("If a jury is discharged without specifying the date, the court upon motion shall fix the date, except that where the date is certain and not in dispute, the date may be fixed by the clerk of the court upon affidavit.").

Courts in this Circuit have recognized it as an option, too.  *See, e.g.*, *CSX Transp., Inc. v. Niagara Lubricant Co., Inc.*, 143 F. Supp. 3d 73, 75 (W.D.N.Y. 2015) ("The parties are entitled to have the jury determine the date from which prejudgment interest should run . . . . "); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*, 727 F. Supp. 2d 256, 295 (S.D.N.Y. 2010) (fixing date from which interest would run because jury was not asked to select one under CPLR § 5001(c)); *see also Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994) (concluding trial court acted reasonably in fixing the date where "[t]he jury was not asked to specify the date when the damages were incurred").

Not a single one of the cases cited by Century in support of its motion to amend the judgment under Rule 59(e) appear to match this fact pattern; *i.e.*, none discard a jury's factual determination about the correct date in favor of a different one selected by the court.

For instance, in *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787 (2d Cir. 1986), a jury found for the plaintiff after concluding the defendant breached certain agreements by unilaterally terminating the parties' ongoing business relationship.  Because the court below had awarded interest as of the date on which the defendant had *first* announced the termination of the business relationship, the panel remanded the matter to the trial court to re-calculate interest from an intermediate date during the period in which the payment obligations would have otherwise been

due. *Esquire Radio & Elecs., Inc.*, 804 F.2d at 796. Missing from the discussion in *Esquire Radio*, however, is an indication that the jury itself had first been asked to select the date or dates from which interest should run. *Id*.

The same is true of *Israel v. Benefit Concepts N.Y., Inc.*, 9 F. App'x 43 (2d Cir. 2001) (summary order). Following a bench trial, the lower court awarded pre-judgment interest running from the breaching party's "first refusal" to make transfers of certain valuable stock, even though the transfers at issue should have occurred in "separate payments over several years." *Id*. at 45. As in *Esquire Radio*, the panel remanded the matter to the trial court to re-calculate the interest award. *Id*. But *Israel* was a bench trial, with the trial court wearing a second hat as finder of fact. *See id*.

Century's other cited cases appear to suffer from the same shortcoming. In *Nat'l Utility Serv., Inc. v. Blue Circle, Inc.*, 793 F. Supp. 52 (N.D.N.Y. 1992), the trial court awarded interest to the prevailing plaintiff in a breach of contract claim by determining the "median date between the accrual of the cause of action and the final month . . . for which an invoice was submitted." But that, too, was a bench trial. *Id*.

In *Washington v. Kellwood Co.*, 2016 WL 845280 (S.D.N.Y. Mar. 4, 2016), the trial court explained it would calculate interest on a portion of the prevailing plaintiff's damages from a "reasonable intermediate date" because that component of the jury's verdict relied on a "lost stream of profits" that would have accrued over time. *Id*. at *4. Again, though, there is no indication the jury was tasked with selecting the date or dates in the first instance. *Id*.

And in *Baer v. Anesthesia Assocs. of Mt. Kisco, LLP*, 870 N.Y.S.2d 92 (N.Y. App. Div. 2d Dep't 2008), the appellate division reduced the interest component of a damages award in a breach of contract action where the plaintiff's claim "was based on a buyout schedule

payable in installments" over a roughly two-and-a-half year period.  *Id*. at 94.  But again, there is no discussion of whether or not the jury took a crack at fixing an appropriate date first.  *Id*.

To be clear, Century received plenty of notice that the Court planned to resolve this issue by asking the jury to decide it.  Under the "damages" section of the final charge, the Court instructed the jury that if it found for Utica "on one or both of its breach of contract claims, [it] must then determine <u>the date</u> as of which Utica Mutual demanded that Century pay on that claim.  Court's Ex. 3, Dkt. No. 629-1 at 30 (emphasis in original).  This date mattered, the Court explained, "<u>because interest runs from that date</u>."  *Id*. (emphasis added).  In turn, the final verdict form asked the jury to decide "the date" on which Utica "provided sufficient proof of loss" under each of the two certificates.  Court's Ex. 4 at 2-3.

The proposed version of the final instructions provided to the parties in advance of the charge conference included this cited language.  *See* FED. R. CIV. P. 51(b).  The same is true of the proposed version of the final verdict form.  *Id*.  In formulating these two documents, the Court considered the various proposals made by the parties in their pre-trial briefing as well as the various requests and objections both parties entered on the record.  Trial Tr. Vol. IX, Dkt. No. 648 at 1496, 1498-1507.

Missing from all of this is any indication that Century lodged an objection to the Court's proposed method of resolving the issue of pre-judgment interest; *i.e.*, by asking the jury to make a finding about the date from which it should run under each agreement in the event Utica prevailed.  *See* Trial Tr. Vol. IX at 1498-1507; *see also ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (explaining that Rule 51 of the Federal Rules of Civil Procedure generally "requires parties to articulate and lodge their

objections to jury charges before they are delivered" so the trial court has an opportunity to cure any alleged defects).

For example, Century could have argued that the selection of multiple dates by the jury would be more appropriate (as to the multiple billings), or perhaps claimed that the jury should be instructed to select a "reasonable intermediate date" from among the multiple billings presented by Utica. Century did not take that approach. Trial Tr. Vol. IX at 1498-1507.

Alternatively, Century could have asserted that posing *any* questions to the jury about the selection of dates would be improper or superfluous in light of the record evidence of Utica's unpaid billings it points to now. Century did not take that approach, either. Trial Tr. Vol IX at 1498-1507.

Nor did Century raise these issues in its trial brief, Dkt. No. 565, in its own proposed instructions, Dkt. No. 563, in its own proposed verdict form, Dkt. No. 562, or in an amended proposed verdict form it submitted during the course of the trial, Dkt. No. 623-1. In fact, Century's proposed verdict form asks precisely the same questions the Court later adopted in the final verdict form. *Compare* Dkt. No. 562, *with* Court's Ex. 4.[4]

Century also could have (but did not) argued to the jury in summation that the appropriate date to fill in on the blank provided by the final verdict form was a "reasonable, intermediate one" based on the billings in the record. Utica, for its part, was savvy enough to take an approach favorable to itself during the closings. Trial Tr. Vol. X, Dkt. No. 649 at 1600

---

[4] Century's amended proposed verdict form takes an entirely different approach to some of the issues at play, Dkt. No. 623-1, without offering any briefing on the date-of-loss question, Dkt. No. 623.

(advocating to jury that date entered on verdict form under 1973 certificate "should be the date of the first bill); *id*. at 1601 (advocating same as to 1975 certificate).

In essence, Century is asking the Court to throw out a pair of specific factual findings made by the jury because it thinks the results unpleasant. Or maybe Century is seeking to avoid the jury's fact-finding because the Court did not use certain magic words on the final verdict form. *Compare* Court's Ex. 3 (instructing jury it must select "the date" on which Utica demanded payment under each agreement "because interest runs from that date"), *with* Court's Ex. 4 (verdict form asking jury to select date of "sufficient proof of loss").

Of course, "verdict questions must be read in conjunction with the judge's charge to the jury." *Vichare v. AMBAC Inc.*, 106 F.3d 457 (2d Cir. 1996). And Century has offered little in the way of a *post hoc* rationalization for why it wanted these questions posed to the jury at all. *See* Def.'s Reply at 13-14. Perhaps it was an attempt by Century to knock out some or all of Utica's invoices—for instance, if the jury had found in Utica's favor on one or both agreements but not picked the date of the first billing(s), then Century would probably still be here, in a post-trial motion, arguing that amounts billed by Utica prior to the date(s) selected by the jury should be carved out from any money judgment entered by the Court.

But even that explanation would have problems now. If, as Century says, the dates and amounts of <u>each and every</u> billing (including the first ones sent out under each agreement) that Utica issued are sitting undisputed in the trial record, then all the jury would

have needed to do under those circumstances is decide whether Utica had proven one or both of its breach of contract claims.[5]

After that, the question of the principal amounts to be awarded, as well as the date or dates from which pre-judgment interest should run, could have been handled directly by the Court. *Cf. Aristocrat Leisure Ltd.*, 727 F. Supp. 2d at 295 (finding it appropriate for the court to fix the date from which interest should run where jury was not asked to do so).

In sum, the Court recognizes the time and expense associated with taking an appeal. *See* Def.'s Letter Motion at Dkt. No. 659 (suggesting that granting Century's request to reduce the interest award would avoid an "unnecessary appeal"). But the Court is extremely reluctant, under the circumstances presented here, to set aside the jury's fact-finding on this matter. In the event the Second Circuit winds up agreeing with Century on this point for one undoubtedly good reason or another, the Court stands ready, willing, and able to follow the appellate court's guidance in re-calculating the pre-judgment interest component of Utica's recovery. For now, though, Century's request will be denied.

### B.  Judgment as a Matter of Law

Century has renewed its three motions for judgment as a matter of law. Def.'s Mem., Dkt. No. 653-1 at 3-14 (renewing filings at Dkt. Nos. 624-26). In the first two, Century advances several reasons why it should still win judgment on one or both of Utica's breach of contract claims. Def.'s Mem. at 4-11. In its third motion, Century contends it is entitled to judgment on each and every one of Utica's various affirmative defenses. *Id*. at 12-14.

---

[5]  Notably, Century correctly argued elsewhere that any recovery on its bad-faith counterclaim, being equitable in character, would be an issue for the Court to decide. Dkt. No. 623.

"Federal Rule of Civil Procedure 50 sets forth the procedural requirements for challenging the sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges—prior to submission of the case to the jury, and after the verdict and entry of judgment." *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*, 546 U.S. 394, 399 (2006).

At the first stage, a defendant may seek judgment as a matter of law if, after a party has been fully heard on an issue during trial, the Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." FED. R. CIV. P. 50(b). Thus, at this second stage, a defendant "may filed a renewed motion for judgment as a matter of law." *Id.*

"The same standard that applies to a pre-trial motion for summary judgment pursuant to FED. R. CIV. P. 56 also applies to motions for judgment as a matter of law made during or after trial pursuant to Rule 50." *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 173 (E.D.N.Y. 2012) (quoting *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993)). In other words, "the movant must show that the evidence, when viewed most favorable to the non-movant, was insufficient to permit a reasonable juror to have found in the non-movant's favor." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018).

Accordingly, a Rule 50(b) motion "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict

against [it].'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

### 1. Utica's Allocation

According to Century, the Court should throw out Utica's claims under both reinsurance agreements because the "uncontroverted" evidence shows Utica billed Century inconsistently with the terms of the 2007 Utica–Goulds settlement. Def.'s Mem. at 4-11. Utica responds that Century's complaints about the settlement and the resulting reinsurance allocation are meritless, were properly rejected by the jury, and should also be rejected now. Pl.'s Opp'n, Dkt. No. 657 at 9-15. In Utica's view, Century's arguments misstate the governing legal principles and ignore contrary evidence the jury could have credited in finding for Utica on its breach of contract claims. *Id.* Century replies that Utica's allocation of the settlement was inconsistent and therefore unreasonable as a matter of law. Def.'s Reply, Dkt. No. 660 at 5-7.

This argument fails to measure up to Rule 50(b)'s demanding standard. In short, Century has rehashed an assertion it made at summary judgment: that Utica's post-settlement allocation is categorically or objectively unreasonable. To support its renewed claim that Utica's conduct was "*per se* unreasonable and in bad faith," Century cites to *Allstate Ins. Co. v. Am. Home Assurance Co.*, 43 A.D.3d 113 (N.Y. App. Div. 2d Dep't 2007), and *U.S. Fid. & Guar. Co. v. Am. Re-Insurance Co.*, 20 N.Y.3d 407 (N.Y. 2013) ("*U.S. F&G*"). According to Century, these two cases confirm that an insurer cannot bill claims differently "with its reinsurer than with its policyholder." Def.'s Mem. at 4.

But this argument begs the question: it begins from the premise that Utica's allocation was definitively inconsistent, which is one of the issues that the parties have been sparring

over this whole time.  So whether or not these two cases establish some kind of categorical limitation, that rule would only necessitate Rule 50(b) relief in favor of Century if the undisputed evidence adduced at trial conclusively established that things unfolded that way.

That is not what happened.  At the close of discovery, Century's accusation that Utica used "two sets of books" when tracking the asbestos settlements, combined with the force of other related evidence marshaled by Century, was compelling enough to deny cross-motions for summary judgment on the issue.  *Utica Mut. Ins. Co.*, 2018 WL 4625404, at *8 ("[N]either party has established, as a matter of law, the propriety (or impropriety) of the allocation decisions at issue here.").

At trial, the jury heard testimony elicited by Century about how Utica seemed to mistreat Century before, during, and after the 2007 Goulds settlement.  And while the "two sets of books" language might have been an evocative way to phrase the assertion that Utica acted in bad faith in making the post-settlement allocation, the Court permitted Century to argue along those lines at trial.  Dkt. No. 621 (ruling, *inter alia*, that Century could use contested phrase at trial); *see, e.g.*, Trial Tr. Vol. X at 1511, 1531 (arguing to jury in closing).

On the other hand, though, there is plenty of trial testimony from Utica witnesses establishing that Utica's conduct remained reasonably consistent, if not exactly perfect, before, during, and after its settlement with Goulds.  *See, e.g.*, Pl.'s Opp'n at 9-13.  And Utica offered the jury a plausible contrary explanation for the separate spreadsheet its employees used to track the settlement.  *Id*. at 11.  The jury evidently credited some or all of this evidence in siding with Utica.  Accordingly, granting Rule 50(b) relief on this issue would be improper.

Besides, Century overstates the impact of *Allstate* and *U.S. F&G* on this jury trial.  Both cases involve the "follow-the-fortunes" or the "follow-the-settlements" doctrines, which as a general matter "bind[ ] a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured:  coverage, tactics, lawsuits, compromise, resistance, or capitulation."  *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 139-40 (2d Cir. 2004) (quoting *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 85 (2d Cir. 2003)).  The doctrine "applies to all outcomes, including settlements and judgments."  *Id*. at 140.  And although the correct usage is context-dependent, courts often use the two terms interchangeably.  *See, e.g.*, *U.S. F&G*, 20 N.Y. 3d at 418.

In *Allstate*, the plaintiff–reinsurer sought a declaratory judgment against its cedent, arguing it was not bound to "follow" the defendant–insurer's allocation of loss to certain reinsurance certificates the defendant purchased in the 1970s.  *Allstate Ins. Co.*, 43 A.D.3d at 114-15, 120.  According to the *Allstate* plaintiff, the cedent's allocation was unreasonable as a matter of law because its position had changed dramatically following the settlement of a separate coverage dispute with its underlying insured.  *Id*. at 120.

The defendant in *Allstate*, a primary insurer, had been sued by its own insured in a separate federal court action.  *Allstate Ins. Co.*, 43 A.D.3d 115-16.  There, the parties fought over certain primary insurance policies the *Allstate* defendant had issued to cover commercial property damage at the insured's industrial sites.  *Id*.  Among other things, the parties disagreed about how many "occurrences," *i.e.*, losses, had happened at each industrial site.  *Id*. at 116.

This issue of "occurrences" was a huge sticking point for both the primary insurer and its insured, since "[t]he number of occurrences dictated the number of [per-occurrence] deductibles that would be applied." *Allstate Ins. Co.*, 43 A.D.3d at 116. And of course, "[m]ore deductibles meant less covered loss under the policies." *Id*.

Because the coverage litigation involved significant, possibly wide-ranging environmental pollution at a large number of the insured's industrial properties, the federal court held a bellwether trial to determine the issues of loss or damage at Windsor Locks, the name of just one of the insured's sites. *Allstate Ins. Co.*, 43 A.D.3d at 116.

After the jury returned a verdict finding that the insured had shown qualifying loss or damage "at seven different areas" of the Windsor Locks site, the parties sought summary judgment from the federal court "on the number of occurrences involved so they could determine the number of $200,000 deductibles to be applied." *Allstate Ins Co.*, 43 A.D.3d at 116.

In the primary insurer's view, eighteen or more individual deductibles should be applied to the seven areas of loss found at this single industrial site; in the insured's view, seven was a more appropriate number of deductibles. *Allstate Ins. Co.*, 43 A.D.3d at 116. The federal court sided with the insured, concluding that only seven "occurrences" had taken place at the Windsor Locks site. *Id*. Because fewer per-occurrence deductibles applied, the insured stood to receive more insurance money as a result of this holding. *Id*.

Dissatisfied with the jury's verdict and the federal court's ruling on the "occurrence" issue, the defendant–insurer moved for a new trial and petitioned for an interlocutory appeal. *Allstate Ins. Co.*, 43 A.D.3d at 116. Although the federal court denied permission to seek interlocutory review of the legal question, the parties managed to settle their dispute

over coverage at this particular site (*i.e.*, Windsor Locks) before the federal court decided the motion for a new trial. *Id*. In settling, neither party budged from its position "as to the number of occurrences" at the Windsor Locks site. *Id*.

The federal court coverage litigation continued over the remaining industrial sites. *Allstate Ins. Co.*, 43 A.D.3d at 116. In the run up to a second trial that would involve issues at several more of these sites, the parties persisted in their competing views of how many "occurrences" had taken place at each location. *Id*. at 116-17.

Importantly, both the insured and the primary insurer believed that multiple occurrences had taken place at each industrial site. *Allstate Ins. Co.*, 43 A.D.3d at 116-17. In other words, the coverage dispute was over just how many occurrences should be tallied for each site, not whether there was more than one. *Id*.

However, as the second trial neared, the primary insurer and its insured engaged in extensive settlement discussions on this and myriad other issues. *Allstate Ins. Co.*, 43 A.D.3d at 117. Eventually, the parties entered a $112 million lump sum global settlement that resolved the coverage dispute for all of the industrial sites at issue in the litigation. *Id*.

Shortly thereafter, the primary insurer's lead counsel cooked up an "analysis for allocating the settlement to the [insured's primary] policies and to defendant's reinsurers" that, almost inexplicably, "treated each site as one occurrence." *Allstate Ins. Co.*, 43 A.D.3d at 117. The defendant–insurer in *Allstate* then used this new analysis to trigger its reinsurance coverage, billing its various reinsurers, including the plaintiff–reinsurer in *Allstate*, "on a one-occurrence-per-site-per-year basis." *Id*. at 118.

When the *Allstate* plaintiff's claims analyst noticed the dramatic inconsistency between the way its cedent had evaluated the "occurrence" issue for years before the final settlement

with the insured, the plaintiff–reinsurer realized that the allocation methodology used by the federal court in the first trial (over the Windsor Locks site) would not have triggered reinsurance obligations under certain policy years. *Allstate Ins. Co.*, 43 A.D.3d at 119. In other words, the *Allstate* plaintiff determined that the defendant–insurer had tried to unfairly inflate its reinsurance recovery. *See id*.

Armed with this information, the plaintiff–reinsurer refused to cough up payment and filed suit against the cedent instead. *Allstate Ins. Co.*, 43 A.D.3d at 119. On cross-motions for summary judgment, the trial court found in favor of the cedent, concluding that the follow-the-fortunes doctrine insulated its decision-making "regardless of any inconsistency between the reinsured's presettlement and postsettlement allocation positions." *Id*. at 120. This made sense, the trial court reasoned, because otherwise the court would be forced into an "intrusive factual inquiry" about the defendant–insurer's settlement process. *Id*.

The Appellate Division reversed, rejecting the trial court's conclusion that the follow-the-fortunes doctrine applied to the particularly outrageous set of facts presented in the record below. *Allstate Ins. Co.*, 43 A.D.3d at 120-21. The court emphasized that the post-settlement allocation at issue:

> reflects, on this record, nothing more than [the defendant–insurer's lead counsel's] subjective judgment, and in effect lends the court's imprimatur to defendant's playing by two sets of rules: one, applied at the insured's claim level where the occurrence deductible is used as often as possible to minimize the amount of the insurer's exposure and loss, and later, in the same loss setting, another, where the occurrence deductible is used as sparingly as possible to maximize the reinsured's recovery against the reinsurer.

*Allstate Ins. Co.*, 43 A.D.3d at 120.

In the Appellate Division's view, the defendant–insurer's post-settlement, one-occurrence-per-site allocation was totally unreasonable. *Allstate Ins. Co.*, 43 A.D.3d at 122. This was so, the court held, because it "directly contradict[ed]" the federal court's ruling about the number of occurrences chargeable to at least the first site (Windsor Locks) over which the parties litigated, and "completely contradict[ed]" the multiple-occurrence position that both cedent and its insured took during the litigation and in settlement talks. *Id*.

Indeed, the *Allstate* court concluded that the set of facts presented in this case were "unlike any other reported case involving the follow-the-fortunes doctrine." *Allstate Ins. Co.*, 43 A.D.3d at 122. Accordingly, it directed the entry of judgment in the plaintiff–reinsurer's favor without the need for any further factual development. *Id*. at 124.

However, nowhere in *Allstate*'s discussion is any *per se* or categorical rule holding that a cedent that changes its allocation pre- and post-settlement has acted unreasonably as a matter of law. Rather, *Allstate* stands for the proposition that courts are still expected to police the outer limits of the reinsurance relationship, and should not permit a cedent to railroad its reinsurer by forcing it to defer to outrageous, bad-faith conduct that runs afoul of a contrary federal court ruling. *Allstate Ins. Co.*, 43 A.D.3d at 123-24.

There is no *per se* or categorical rule lurking in *U.S. F&G*, either. In fact, the New York Court of Appeals explicitly rejected an argument running in the other direction; *i.e.*, that evidence of an allocation's pre- and post-settlement consistency is itself sufficient to demonstrate reasonableness as a matter of law.

In *U.S. F&G*, the parties litigated the question of whether the follow-the-settlements doctrine obligated a group of defendant–reinsurers to accept the cedent's allocation of a

settlement it had entered into with its underlying insured to resolve a decade-long, multi-million dollar coverage dispute over asbestos claims. *U.S. F&G*, 20 N.Y.3d at 415-17.

In the defendant–reinsurers' view, the cedent's allocation for reinsurance purposes improperly "minimize[d] the burden on itself and maximize[d] the cost" on them. *U.S., F&G*, 20 N.Y.3d at 415-17. After the trial court rejected this argument and granted summary judgment to the plaintiff–insurer, the Appellate Division affirmed over a dissenting justice's insistence that a triable issue of fact remained about the reasonableness of some of the more questionable decisions the cedent made during the settlement. *Id*. at 417.

The Court of Appeals reversed in part, modifying the Appellate Division's order to deny summary judgment to the plaintiff–insurer on two particular issues. *U.S. F&G*, 20 N.Y.3d at 417. In so modifying the lower court's order, the *U.S. F&G* court began by adopting the widely held view that a cedent's allocation decisions, like virtually all other decisions it makes, are entitled to a measure of deference. *U.S. F&G*, 20 N.Y.3d at 419.

This rule made prudential sense, the high court reasoned, because "[d]eference to a cedent's decisions makes for a more orderly and predictable resolution of claims." *U.S. F&G*, 20 N.Y.3d at 419. To hold otherwise "would invite long litigation over complex issues that courts may not be well equipped to resolve, creating cost and uncertainty and making the reinsurance market less efficient." *Id*.

At the same time, however, the *U.S. F&G* court emphasized that this general principle can only take you so far—the deference owed to a cedent's decision-making does not completely immunize it from judicial scrutiny. *U.S. F&G*, 20 N.Y.3d at 420. Instead, the court held that "a cedent's allocation of a settlement for reinsurance purposes will be binding on a

reinsurer if, but only if, it is a reasonable allocation, and consistency with the allocation used in settling the underlying claim does not by itself establish reasonableness." *Id*. at 421-22.

What is reasonableness in this context?  For starters, the *U.S. F&G* court observed that reasonableness does not require a cedent to disregard its own interests, or to put the interests of its reinsurer ahead of its own.  20 N.Y.3d at 420.  And where several different reasonable allocations might be possible, the court took the view that it was "unrealistic to expect that the cedent will not be guided by its own interests in making the choice" between them.  *U.S. F&G*, 20 N.Y.3d at 421.

In giving more specific guidance, the *U.S. F&G* court opined that a reinsured's allocation of a settlement would satisfy this test if it was "one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist."  20 N.Y.3d at 420.

On this point, the *U.S. F&G* court cited approvingly to *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143 (3d Cir. 2010), which explained that a cedent cannot make allocation decisions "primarily for the purpose of increasing its reinsurance recovery."  *Id*. at 158.  However, unlike the more freewheeling inquiry into the cedent's subjective motivations contemplated by the Third Circuit in *Travelers*, the Court of Appeals in *U.S. F&G* cautioned that, at least in the mine-run of reinsurance disputes, the cedent's subjective motivation for its decision-making should *generally* be unimportant.  *U.S. F&G*, 20 N.Y.3d at 421; *but see Travelers Cas. & Sur. Co.*, 609 F.3d at 158-59.

Applying these principles to the facts presented, the *U.S. F&G* court rejected the notion that the plaintiff–insurer's allocation was reasonable as a matter of law simply because the allocation the cedent "used in billing the reinsurers was one that it discussed and agreed

on in negotiations" with its insured. *U.S. F&G*, 20 N.Y.3d at 421. Instead, the court remanded the case for trial on the reasonableness of certain decisions made by the cedent in connection with the settlement and subsequent reinsurance allocation. *Id*. at 425-26, 429.

In sum, nowhere in *Allstate* or *U.S. F&G* is any categorical rule that "inconsistent allocations are always unreasonable as a matter of law." Rather, *Allstate* signals that dramatically inconsistent pre- and post-settlement allocations, or perhaps ones in direct contravention of federal court rulings, can be unreasonable as a matter of law.

And *U.S. F&G* signals that it is sometimes appropriate to take allocation cases to trial to determine whether the cedent acted reasonably when settling with its insured; *i.e.*, whether "parties bargaining at arm's length, in a situation where reinsurance was absent, could reasonably" have reached the result being challenged by the reinsurer.

Thus, *U.S. F&G* recognizes that the follow-the-settlements doctrine sweeps broadly enough to permit the resolution of most reinsurance disputes at summary judgment while acknowledging that some edge cases will still require a trial. Indeed, *U.S. F&G*'s guidance on this issue found its way into the Court's jury instructions in this case:

> What is objective reasonableness? Consistency with the allocation used in settling the underlying claim does not by itself establish reasonableness. If there is more than one reasonable allocation, the cedent may choose the one that is more favorable to itself. The standard of reasonableness does not require the ceding company to disregard its own interests. Rather, the standard means that the ceding company's allocation of the settlement must be one that the parties to the settlement might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist.

Court's Ex. 3 at 25.

Century is therefore wrong to insist that "the issue should never have been presented to the jury." Def.'s Mem. at 6. Reasonableness as a matter of law could not be decided at

summary judgment because of the unique circumstances of this particular edge case, so the Court let the fact-bound question go to a jury. The jury sided against Century, and there was sufficient evidence from which it could properly do so in light of the governing principles set out by the New York Court of Appeals in *U.S. F&G*. *See, e.g.*, Pl.'s Opp'n at 11-15 (recounting trial evidence). Accordingly, this argument will be rejected.

### 2. <u>The Mid-Term Endorsement</u>

Alternatively, Century insists the Court should at least throw out Utica's claim under the 1973 agreement, since Utica never established that Century consented to the mid-term modification on which Utica relied to bill defense costs in addition to limits. Def.'s Mem. at 4-11. Utica responds that the appropriate question is whether Utica acted reasonably in billing under the endorsement based on what it knew at the time. Pl.'s Opp'n at 15-17. Framed that way, Utica points to evidence that supports the jury's implicit conclusions about the endorsement. *Id*. In reply, Century reiterates that the law governing endorsements to a contract requires evidence of the counter-party's consent. Def.'s Reply at 7-10. According to Century, Utica failed to introduce any at trial. *Id*.

This Rule 50(b) motion fares no better than the first one. In Century's view, any change to the terms of the parties' agreement needed to accord with traditional contract principles surrounding the modification of a contract. Def.'s Mem. at 7-11; *see, e.g.*, *Kaplan v. Old Mutual PLC*, 526 F. App'x 70, 72 (2d Cir. 2013) (summary order) (setting forth New York law on contract modification).

Again, Century's contention fails to grapple with how the parties actually litigated this issue. At the close of discovery, the Court denied Century's motion for partial summary

judgment on its assertion that the mid-term endorsement identified did not apply to the 1973 certificate because:

> A review of the parties' submissions reveal genuine disputes of material fact that preclude summary resolution of this issue. Among other things, Utica has submitted evidence to substantiate its position that the mid-term endorsement did not actually "modify" the agreement in the manner claimed by Century. Instead, Utica argues that the 1973 Certificate permitted Utica, as cedent, to issue endorsements, like the mid-term endorsement at issue here, without receiving consent from the reinsurer. According to Utica, standard underwriting practices would have required it to inform Century of any endorsements anyway—and that there is evidence to substantiate Utica's assertion that it acted in conformity with those practices when transmitting endorsements to Century.

*Utica Mut. Ins. Co.*, 2018 WL 4625404, at *14.

Conversely, in the run up to trial, the Court rejected an attempt by Utica to preclude Century from arguing this consent/modification theory to the jury. Dkt. No. 621 (ruling, *inter alia*, that Century could introduce evidence tending to show that "Utica needed to obtain consent to the defense endorsement"). In other words, the Court declined to sanction either party's theory of how the mid-term endorsement might fit into the peculiar facts of this case.

The Court took this approach because the documentary evidence, viewed alone, seemed inconclusive. Utica "discovered" the endorsement when an employee ran across a written copy, which is unsigned, several months after executing the 2007 settlement agreement with Goulds. In Utica's view, the lack of a signature did not answer the question of whether the endorsement had actually been issued to Century. According to Utica, the copy it discovered is an underwriting copy, which were often unsigned in 1970s. Thus, Utica focused on other indicia, such as typed information identifying the policy number and the effective date, to argue the endorsement was actually issued to Century.

Century, of course, took issue with this assertion.  In its view, this kind of endorsement would certainly have been signed if it had actually been issued.  Century seized on the notion that the version "discovered" by Utica could have been nothing more than an internal draft document.  According to Century, there was no evidence that Utica ever sent the endorsement out to Century or that Century, as counter-party to the modification, ever formally approved it.

Utica argued that it didn't matter whether Century had a record reflecting its formal approval of the change in coverage.  According to Utica, the endorsement just required the cedent to provide the reinsurer with notice, which Utica planned to establish, at least in part, through custom and practice evidence.

As for Century's eminently reasonable suggestion that it would have required Utica to shell out some more premium payment in consideration for the increased risk it would be taking on through the endorsement, Utica claimed that, as strange as it may seem to us now in 2019, in the 1970s this kind of mid-term change to a reinsurance agreement was not unusual because long-tail risks like asbestos were not on the underwriters' minds.

Aside from rejecting Century's assertion that a "clear and convincing" standard of evidence should apply to Utica's attempt to prove up the missing information, the Court permitted the parties to introduce evidence at trial that roughly tracked these two competing views of the endorsement's applicability.  Pl.'s Opp'n at 15-18 (discussing Utica's evidence at trial).

As Utica points out, at least one of its witnesses testified that the reinsurance certificate in question did not require the reinsurer's explicit approval for endorsements.  Trial Tr. Vol. V, Dkt. No. 641 at 788:8-15.  As Utica also points out, testimony of its other

witnesses tended to show that certain reinsurance principles applicable to the underlying umbrella policy, including the follow-the-fortunes provision, made formal modification unnecessary under these circumstances.  In sum, then, Century has failed to demonstrate a complete absence of evidence supporting the verdict.  Accordingly, this Rule 50(b) motion will also be denied.

### 3.  Utica's Affirmative Defenses

In its third motion, Century contends that it is entitled to judgment as a matter of law on Utica's seven affirmative defenses.  Def.'s Mem. at 12-14.  Utica responds that these issues are mooted by the jury's verdict.  Pl.'s Opp'n at 18-20.  Century replies that these defenses would be back in play if the Court ordered a new trial on one or both agreements.  Def.'s Reply at 10.

Upon review, the Court agrees that Century's third request for Rule 50(b) relief is mooted by the jury's verdict.  This is especially so since, as discussed *infra*, Century's motion for a new trial will be denied in all respects.  However, the Court also finds persuasive Utica's arguments in opposition on these points, Pl.'s Opp'n at 18-20, and adopts them to the extent a live dispute remains.  Accordingly, this motion for Rule 50(b) relief will also be denied.

### C.  Century's Request for a New Trial

Next, Century argues the case should be tried again, either because the jury's verdict is against the weight of the evidence or because a juror failed to disclose a relationship with one of Utica's witnesses.  Def.'s Mem. at 14-24.

Under Rule 59, a court "may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a)(1)(A).

"The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence of the giving or refusal of instructions to the jury; or (4) damages are excessive." *Welch*, 871 F. Supp. 2d at 174 (citation omitted).

"The standards governing a district court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evidence differs in two significant ways from the standards governing a Rule 50 motion for judgment as a matter of law." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998).

First, "a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp.*, 163 F.3d at 134; *see also Fireman's Fund Ins. Co.*, 287 F. Supp. 3d at 168. Second, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp.*, 163 F.3d at 134 (citation omitted).

However, "the granting of a new trial is an extraordinarily relief, and one that is properly granted only upon a showing of exceptional circumstances." *Welch*, 871 F. Supp. 2d at 174 (citation and internal quotation marks omitted). Accordingly, "[i]t is well-established that a district court may grant a new trial under Rule 59 only if it concludes that the jury reached a 'seriously erroneous result' or that the 'verdict is a miscarriage of justice.'" *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 573 (S.D.N.Y. 2011) (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003)).

## 1. <u>Weight of the Evidence</u>

As to the weight of the evidence, Century offers four reasons to conclude the jury's verdict runs counter to the facts established at trial. First, Century reiterates its claim that it

was never on board with any mid-term endorsement to the 1973 agreement.  Def.'s Mem. at 15-17.  Second, Century returns to its assertion that Utica's post-settlement allocation of defense costs to Century was objectively unreasonable.  *Id*. at 17-18.  Third, Century resurrects its contention that it cannot be liable under the 1975 agreement because it is not the successor-in-interest to the company that issued the certificate.  *Id*. at 19-20.  Fourth, Century insists the jury erred in rejecting its bad-faith counterclaim.  *Id*. at 20-21.

Utica responds to Century's desire for a new trial on the breached agreements by carefully cataloguing the extensive evidence supporting the jury's pro-Utica verdict.  Pl.'s Opp'n at 20-25.  As Utica points out, Century's arguments focus on its own witnesses' favorable testimony without doing much to explain why the Court should totally discount Utica's contrary evidentiary showing, which the jury appears to have reasonably relied on in finding for Utica.  *Id*.

Century's reply memorandum borrows from its prior exposition of how the legal issues in this case should shake out.  Def.'s Reply at 10-14.  In Century's telling, a new trial is warranted because Utica failed to establish that Century ever consented to the mid-term endorsement.  *Id*. at 10-11.  Century also maintains that Utica has failed to rebut its showing that the allocation following the settlement with Goulds was objectively unreasonable.  *Id*. at 11-12.  Century then returns to its claim that it cannot be liable under the 1975 agreement because some other entity is the appropriate successor-in-interest to INA's reinsurance business.  *Id*. at 12-13.  Beyond that, Century emphasizes that the jury's rejection of its bad-faith counterclaim runs against the weight of the evidence, which includes repeated instances of Utica's witnesses failing to disclose material information to Century.  *Id*. at 13-14.

Measured against the appropriate standard, though, Century's various weight-of-the-evidence arguments come up short.  The jury heard live or pre-recorded testimony from twenty witnesses, some of whom helped to introduce a mountain of bankers' boxes stuffed with the documentary evidence relevant to this dispute.  Others assisted the jury with the process of reconstructing certain pieces of this decades-old paper puzzle or offered evidence about Utica's settlement with Goulds, including testimony from Utica officers and employees who handled that task.  Still others described how Utica's reinsurance relationships were impacted by the settlement and the allocation.  After independently weighing all of this evidence, the Court is far from convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice.  Accordingly, this branch of Century's Rule 59 motion for a new trial will be denied.

### 2.  <u>Fairness of the Trial</u>

Finally, Century declares the trial might well have been tainted by a juror's undisclosed relationship with Bernard Turi, one of Utica's star witnesses.  Def.'s Mem. at 22-24.  Century, relying on the Supreme Court's decision in *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), insists it "should be granted an opportunity to take discovery on that relationship and, if appropriate, renew this motion [for a new trial] after discovery is complete."  Def.'s Mem. at 22.  Utica responds that Century's theory of juror misconduct is totally baseless and therefore the Court should reject it out of hand.  Pl.'s Opp'n at 25-30.  Century replies that Utica's protests about this claim are exaggerated, since it is only seeking *discovery* into the possibility of improper juror behavior.  Def.'s Reply at 14.

In *McDonough*, the Supreme Court considered the circumstances under which a juror's non-disclosure of information warranted a new trial.  The underlying action involved a

state law diversity claim brought in federal court against a lawn mower manufacturer by the parents of a child who suffered injuries from the mower's blades. *McDonough Power Equip., Inc.*, 464 U.S. at 549.

During *voir dire*, the plaintiffs' attorney asked prospective jurors whether they, or anyone in their immediate family, had sustained injuries from an accident "that resulted in any disability or prolonged pain or suffering." *McDonough Power Equip., Inc.*, 464 U.S. at 549-50. This question, which was posed to the whole jury panel rather than any specific prospective juror, did not elicit a response from Ronald Payton, who was later seated as a juror. *Id*. at 550.

After a three-week trial, the jury returned a verdict that did not include an apportionment of fault to the defendant–manufacturer. *McDonough Power Equip., Inc.*, 464 U.S. at 550. Instead, through a quirk of Kansas products liability law, the jury apportioned fault for the accident among three non-defendants: the child's mother, the child's father, and the next-door neighbor operating the mower at the time of the injury. *Id*.

In post-trial proceedings, the losing plaintiffs sought permission to approach the members of the jury and in particular to question Mr. Payton, whom they alleged had failed to disclose during *voir dire* that his son had once been seriously injured by the explosion of a truck tire. *McDonough Power Equip., Inc.*, 464 U.S. at 551.

Following that inquiry, the plaintiffs learned that the juror's son had in fact suffered a broken leg from an exploding tire at some point in the past. *McDonough Power Equip., Inc.*, 464 U.S. at 555. According to the juror, he had not disclosed his son's injury during the *voir dire* examination because he did not consider it "severe" within the meaning of the question posed by the plaintiffs' attorney. *Id*. at 551 n.3. Based on that information, the plaintiffs

sought and were denied a new trial on, *inter alia*, their contention that the juror's failure to respond affirmatively to the personal-injury question on *voir dire* had prejudiced the proceedings. *Id*. at 551.

On appeal, a panel of the Court of Appeals for the Tenth Circuit granted the plaintiffs a new trial, reasoning that the undisclosed information "indicated probable bias." *McDonough Power Equip., Inc.*, 464 U.S. at 552. In the Tenth Circuit's view, the apparently good-faith nature of the juror's mistake was irrelevant. *Id*. What mattered, the court said, was whether "an average prospective juror would have disclosed the information" revealing the probable bias claimed by the plaintiffs below. *Id*.

The Supreme Court granted *certiorari* and reversed. *McDonough Power Equip., Inc.*, 464 U.S. at 552. In doing so, the Court acknowledged that a fair trial requires an impartial trier of fact; *i.e.*, "a jury capable and willing to decide the case solely on the evidence before it." 464 U.S. at 554 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). And it was true, too, the Court agreed, that *voir dire* protects this fair trial right by

> exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to service its purpose is obvious.

*McDonough Power Equip., Inc.*, 464 U.S. at 554.

Even so, then-Associate Justice Rehnquist's majority opinion for the Court forcefully rejected the idea that perfection was somehow the ultimate goal of *voir dire* examination. *McDonough Power Equip., Inc.*, 464 U.S. at 553; *id*. at 555 ("To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a

question, is to insist on something closer to perfection that our judicial system can be expected to give.").

The Court reasoned that prospective jurors, "[c]alled as they are from all walks of life, . . . may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *McDonough Power Equip., Inc.*, 464 U.S. at 555. Thus, the Court concluded the Tenth Circuit's "average juror" standard would be too difficult to apply to these kinds of disputes. *Id*.

Instead, the Court in *McDonough* fashioned a more demanding standard: "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc.*, 464 U.S. at 556.

The Second Circuit has adopted *McDonough*'s holding as a two-part test, applying it in both civil and criminal cases. *See, e.g.*, *United States v. Nix*, 275 F. Supp. 3d 420, 437 (W.D.N.Y. 2017) (collecting cases applying *McDonough*); *accord Tinsley v. Borg*, 895 F.2d 520, 524 (9th Cir. 1990) ("Th[e] [*McDonough*] standard applies in civil and criminal cases.").

First, a party must demonstrate the juror "deliberately lied or consciously deceived the Court, as opposed to providing inaccurate responses as a result of a mistake, misunderstanding or embarrassment." *Nix*, 275 F. Supp. 3d at 437. Second, "the Court must determine if it would have granted a hypothetical cause challenge if [the challenged juror] had responded accurately to the Court's questions." *Id*. at 438. "Challenges for cause

are generally based on actual bias, implied bias, or inferable bias." *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002).[6]

Century argues limited post-trial discovery is warranted because Juror No. 3 may have run afoul of the rule set out in *McDonough*. In Century's view, it "is likely entitled to a new trial because it appears that Utica failed to disclose a professional relationship between [Juror No. 3] and Utica's General Counsel Bernard Turi." Def.'s Mem. at 22. As Century explains it, Juror No. 3 "works, either directly or indirectly, for Bernard Turi's current or former wife, Carol Turi, at Upstate Cerebral Palsy, Inc." *Id*. at 22-23.

Century's submissions establish that Carol Turi is First Vice President of the Board of Directors at Upstate Cerebral Palsy, Inc. ("UCP"), a Utica-area non-profit organization that provides programs and services to children and families with developmental disabilities. Ex. B to Weisband Decl., Dkt. No. 653-4; *see also* http://www.upstatecp.org/about/board-of-directors/ (last visited Nov. 25, 2019).

Century substantiates its claim of a possible "relationship" to Juror No. 3 by submitting UCP's Internal Revenue Service Form 990 from the 2017 tax year, which shows that Ms. Turi averages about an hour per week in her role on UCP's board. Ex. A to Weisband Decl., Dkt. No. 653-3 at 17. Juror No. 3, on the other hand, is a UCP employee who "oversee[s] residences where kids with disabilities live." Trial Tr. of Jury Selection, Dkt. No. 651 at 49:16-25.

_____

[6] "Actual bias is bias in fact." *Greer*, 285 F.3d at 171 (citing *United States v. Torres*, 138 F.3d 38, 43 (2d Cir. 1997), *cert. denied*, 523 U.S. 1065 (1998)). "Implied bias, by contrast, is bias presumed as a matter of law." *Id*. (citation omitted). "Finally, inferred bias is available when actual or implied bias does not apply." *Id*. "Bias may be inferred when a juror disclosed a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Id*.

Upon review, Century's request for discovery based on this theory of possible juror misconduct will be denied.  As Utica points out, Century cites *McDonough* but does not even attempt to apply its teachings.  At step one of *McDonough*, the only question Century suggests Juror No. 3 might have failed to answer honestly is buried in a footnote—Century suggests Juror No. 3 should have been more forthright in response to the Court's general query to the panel about "any connections" they might have to Utica.  Def.'s Mem. at 22 n.41.

But this theory of juror misconduct is awfully similar to the one rejected by the Supreme Court in *McDonough*, which warned the lower courts not to impose a hyper-technical or sweeping disclosure requirements to every honest-but-arguably-mistaken answer given by a prospective juror during *voir dire*.

As the Form 990 relied on by Century also shows, UCP employed 2,390 workers and 301 volunteers in 2017.  Ex. A to Weisband Decl. at 2.  Beyond that, the Court takes judicial notice of the fact that UCP has nearly thirty different locations across Central New York.  *See* https://www.upstatecp.org/locations/ (last visited Nov. 26, 2019).  While Juror No. 3 presumably works at one of these locations, Ms. Turi, a board member, spends about an hour a week at one of them, probably the organization's administrative office.

To even warrant discovery into this theory of possible juror misconduct, Century needs to make some kind of basic, threshold showing of impropriety beyond mere generalized speculation.  *Cf. United States v. Sattar*, 395 F. Supp. 2d 66, 72-73 (S.D.N.Y. 2005) (requiring strong indication that a specific impropriety has occurred to warrant further proceedings on a *McDonough*-based jury misconduct claim).

And the problem with Century's theory is that it rides the wrong side of that line: Century has not even established a non-speculative connection, professional or otherwise, between Juror No. 3 and Ms. Turi, let alone one between Juror No. 3 and Mr. Turi.[7]

Where, as here, an out-of-towner winds up going to trial against a large employer that calls the judicial district its home, a not-insubstantial portion of the jury pool is going to have some kind of tenuous "connection" to the entity if you look hard enough.

But the *voir dire* process is not concerned with connections that might be established at several degrees of separation; it exists to help safeguard the litigants' right to a fair trial by ferreting out actual, implied, or inferable bias. Because there is not a whiff of any such bias here, Century's request for discovery on this issue will be denied.

## V. <u>CONCLUSION</u>

The parties have spent years litigating thorny issues raised in the wake of Utica's 2007 settlement with Goulds. Those issues were complicated, in no small part, by both parties' short-sighted document retention policies. The Court gave both sides a full and fair opportunity to air their grievances to a jury, which eventually sided with Utica. Because Century has failed to establish any grounds for post-trial relief, its motions must be denied.

Therefore, it is

ORDERED that

1. Century's motion to amend or correct the judgment is DENIED;

2. Century's renewed motions for judgment as a matter of law are DENIED;

---

[7] In opposition, Utica submitted an affidavit from Mr. Turi, who explains that Carol Turi is his former spouse. Turi Aff., Dkt. No. 657-1. The pair legally separated in 2012, *id.* ¶ 5, and divorced in 2015, *id.*

3.  Century's motion for a new trial is DENIED; and

4.  Century's motion for post-trial discovery is DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  December 3, 2019
        Utica, New York.